RUDOLPH H. BIEZE *et al.*, Plaintiffs, *v.* JOE COCA *et al.*, Defendants.— (TULLY TRAINOR, Plaintiff-Appellee and Cross-Appellant, *v.* CENTRAL NATIONAL BANK IN CHICAGO, Defendant-Appellant and Cross-Appellee.)

First District (4th Division)   No. 62142

Opinion filed October 6, 1977.

Ronald Butler, Robert G. Foster, and Logan T. Johnston III, all of Winston & Strawn, of Chicago, for appellant.

Irving M. Friedman, Harold A. Katz, Arthur Brody, and Joseph M. Taussig, all of Chicago, for appellee.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

On April 3, 1975, an order was entered in the Circuit Court of Cook County, Illinois, Chancery Division (1) granting the motion for summary judgment of the successor receiver for the Taxicab Drivers Maintenance and Garage Helpers, Local 777, Health and Welfare Plan and Trust (hereinafter referred to as the Plan or Trust); (2) denying the motion of the defendant, Central National Bank in Chicago (hereinafter referred to as Central or the Bank), for summary judgment; and (3) awarding damages of $50,481.03 to the successor receiver. The defendant appeals from the order; the plaintiff cross-appeals.

The issues presented for review are (1) whether the trial court acted properly in granting the plaintiff's motion for summary judgment and

denying the defendant's motion for summary judgment and (2) whether the proper measure of recovery is the entire amount of the earnings produced by the Plan funds while deposited with the defendant.

In December 1958, Yellow Cab Company, Checker Taxi Company, Inc., and the Transportation Maintenance Corporation entered into an agreement with Taxicab Drivers Maintenance and Garage Helpers Union, Local 777, the union then representing the companies' respective employees. The agreement established a health and welfare plan and trust fund pursuant to the collective-bargaining agreements in effect between the companies and the union. The purpose of the Plan was to provide certain health and welfare benefits for eligible employees from either the principal or income of the Plan assets and trust account.

The Plan provided for a board of trustees to administer the Plan, consisting of four regular trustees and two alternate trustees. There were to be two regular employer trustees and one alternate, and two regular union trustees and one alternate. The regular trustees appointed by the employer companies were Michael Sokoll and Rudolph Bieze. The appointed regular union trustees were Joseph Glimco and Joe Coca. The Plan provided that the board, as trustee, should have complete and exclusive control over all Ilan assets.

The litigation from which this appeal arises apparently commenced in 1961 when the employer trustees, Yellow Cab Company and Checker Taxi Company, Inc., filed a petition for instructions complaining of the union trustees and various other defendants. The petition alleged that due to controversies between the various trustees, the Plan could not operate effectively without a declaration of the rights of the participating employees and of the rights and duties of the trustees. A receiver was eventually appointed for the Plan in 1970. Further details of the history of this litigation are not critical to this appeal.

On February 15, 1974, William Randall, the appointed receiver for the Plan, filed an amendment to the complaint in the nature of an additional count naming Central as the amended defendant. The amended complaint alleged that Central became a fiduciary and a trustee for the trustees of the Plan, pursuant to a valid safe-keeping receipt executed between the trustees and Central. Under the receipt, Central held certain United States Treasury Bonds belonging to the Trust for collection. The receipt provided that the collected proceeds would be disbursed only in accordance with the directions of the depositor trustees. On May 15, 1966, the Bank presented the bonds for collection and received proceeds in the sum of $250,000. The complaint stated that the defendant Bank knew or should have known that any legal authorization regarding the Trust could only be made in writing with two signatures, one by an employer trustee and the other by a union trustee. And, further, that the Bank as trustee and

fiduciary, should have known that the trustees desired that the bond proceeds be placed in an income producing account since the money belonged to the Trust. Therefore, according to the complaint, the Bank breached its duty as fiduciary and trustee when on May 16, 1966, without instructions or authorization from the Plan trustees, it credited the bond proceeds to the trustees' checking account and failed to place the proceeds in an income, interest, or dividend producing account. The proceeds remained in the trustees' checking account until November 23, 1970. During that time, no interest was credited to that account.

Alleging that the Bank was unjustly enriched to the detriment and expense of the Trust by the free use of the collected proceeds for its commercial benefit, the receiver sought to recover all sums of money by which the Bank had become so enriched, plus interest or compensation for the use of the proceeds, in addition to costs and reasonable attorneys fees. The prayer included that Central be required to account to the receiver for any profits, income increment, or gain obtained from the use and benefit of the bond proceeds.

The Bank, in its amended answer, denied that it was a trustee for the Plan trustees but admitted its fiduciary capacity. The Bank asserted various affirmative defenses, including equitable laches and expiration of the applicable statute of limitations. Central argued, in support of its motion for summary judgment, that the relationship between a bank and its depositor is that of debtor and creditor rather than trustee and beneficiary. The Bank relied in part on the Restatement (Second) of Trusts, Explanatory Notes §12, comment 1, at 41 (1959), which provides:

> "A general deposit of money in a commercial bank does not create a trust, but a relation of debtor and creditor, the depositor having in addition to his rights as creditor certain contract rights against the bank. This is true although the depositor is a trustee;
> * * * "

Thus, according to the Bank, it had no legal duty to invest the collected proceeds and was obligated only to follow the specific terms of the safekeeping agreement. The trial court commented that although Central may not have become a trustee, a fiduciary relationship probably existed between the Bank and the trustee depositors.

It is undisputed that the trustees maintained no savings or interest bearing accounts with Central, and at no time did they give to Central authorization or instructions to reinvest the collected proceeds. The Bank asserted that before the bond proceeds were collected and credited to the checking account, tremendous effort was made by Bank personnel to contact the trustees for instructions regarding the disposition of the

proceeds. The trustees failed to provide the Bank with any instructions. However, the successor receiver, Tully Trainor, argued that the Bank had failed to contact the employer trustees, and had contacted only the union trustees. Trainor contended that any negligent or wrongful acts of any trustee did not relieve the Bank of its fiduciary and contract obligations. According to Central, however, it was never informed of, and was totally unaware of, the difficulties that existed at that time between the employer and union trustees.

The Bank concluded that had it acted without instructions and unilaterally placed the proceeds in one of the many available investment plans, it would certainly have breached its contract with the Plan trustees; the safekeeping agreement authorized the Bank as holder of the bonds only to "keep safe and redeem." The language of the receipt defined the obligation of the Bank as follows:

> "This bank's services are limited to holding the securities in safekeeping for the depositor and dealing with them as herein expressed unless otherwise agreed in writing."

The receipt provided that the proceeds of collection be disbursed in accordance with instructions left on record with the Bank. No instructions were ever on record with or communicated to Central. Central pointed out that it probably would have been negligent to place the redeemed proceeds in the mail to the trustees simply because no clear instructions had been provided. Delivery to the trustees in specie was determined to be impractical, dangerous, and unnecessary since a simple credit to an existing trustee account would serve the same purpose. Thus, the bond proceeds were promptly credited to the trustee depositors' major demand account following redemption. The money remained in this account from May 17, 1966, until November 23, 1970, when the original receiver withdrew the funds and closed the account.

Central asserted that while the funds remained on deposit, the trustees were sent regular monthly statements for the checking account and approximately 120 checks, all subject to the compulsory signature requirements, were drawn on the account. The Bank attached to its summary judgment motion the affidavit of Joseph Glimco. He stated that whenever a check withdrawal was made, two signatures were always required. One signature was required to be, and always was, that of an employer trustee. Glimco stated that the signing employer trustee was primarily Rudolph Bieze.

The record also indicates that the trustees had an annual audit of the Plan conducted by an independent public accounting firm. According to the defendant, the year-end 1966 annual Plan audit report to the trustees contained the following statement:

"On May 15, 1966, the Trust Account [No. 147249 in question] was credited with $254,687.50 representing the redemption * * * plus [government] interest on that date."

The report also exhibited a deposit of that amount in that account and a year-end balance of $381,540.84. This balance was apparently substantially higher than the previous year-end balance for that account. The defendant claims that the annual reports for 1967 through 1969 all exhibit year-end balances in excess of $350,000 for the Trust account. However, at no time during this 4½-year period of deposit did any Plan trustee request an alternate placement of the proceeds or submit any protest, written or oral, to the Bank. Rudolph Bieze, in his deposition, testified that he had read some of the annual audit reports, but that he "certainly didn't take the time to study them for every year because I wasn't actively interested in that."

Raymond Ruge, a vice-president at Central, stated in his affidavit that whenever a customer requested the Bank to handle the redemption of registered government securities on his behalf, if that customer already had a demand account at Central, any proceeds collected would immediately be credited to that account. This would be done immediately and prior to any other action, irrespective of the existence of instructions, in order to permit the customer prompt access to the funds. Ruge attested that at Central and "in the trade," this policy is referred to by custom and practice as "making a track record of the funds"; its purpose is to establish proof of delivery of the proceeds to the customer.

Ronald Vetterick, a vice-president at Central, stated in his affidavit that it was an important policy at Central to receive clear investment instructions from a customer before any investment was made. He stated that this policy becomes particularly important where the funds of union health and welfare plans are involved since such plans often have restrictions on investing and any deviation from authorized investment areas could create serious problems. Vetterick stated that he had engaged in several telephone conversations with various Plan trustees concerning the bonds and expected proceeds prior to redemption. The communication occurred because the Bank had no clear instructions regarding the proceeds and did not have full knowledge of any existing investment restrictions.

Joseph Glimco, in his deposition, testified that he was appointed the administrative trustee of the Plan to handle the "daily work." He indicated that in May 1966, he was fully aware that the bonds held by Central had matured, and that he had been "receiving harassment by the Bank to do something about them." He stated he received so many calls from the Bank that "it just irritated me to no end. I shoved it off. What could I do about it." According to Glimco, although he was fully aware

that the Plan's accounts at Central were all non-interest bearing, he was unable to give the Bank any instructions because he did not have the authority to do so. He told the Bank that he would "get back to them," but failed to do so.

Joseph Coca, in his deposition, testified that he was aware at all times that the accounts at Central were non-interest bearing. He stated that from 1962 to 1965 he engaged in a number of discussions with certain officers of the Bank who suggested that the Trust funds be placed in an interest bearing account. However, this could not be done without the required trustee approval.

On April 3, 1975, the trial court entered a judgment order which sustained the plaintiff's motion for summary judgment and denied the defendant's motion. The court found that Central had become an agent and fiduciary of the Plan trustees by reason of the safekeeping agreement. And, further, that Central became unjustly enriched by the profits made from the collected proceeds while the money was on deposit, intermingled with general corporate funds and used by the Bank for its corporate purposes. The court determined that Central became unjustly enriched to the extent of the amount of interest that would have been paid by the Bank on an ordinary savings account deposit having an opening balance of $250,000 for the period from May 17, 1966, to and including November 23, 1970, or the sum of $50,481.03.

The defendant argues on appeal that the trial court erred when it found that the intermingling of the collected proceeds with general corporate funds resulted in the unjust enrichment of the Bank and subsequently granted plaintiff's motion for summary judgment. According to the Bank, the trial court failed to consider two fundamental rules of banking law: (1) that banks may use for profit funds held on general deposit, and (2) that checking accounts are a form of general deposit. (See *People ex rel. Nelson v. Sheridan Trust & Savings Bank* (1934), 358 Ill. 290, 193 N.E. 186; 10 Am. Jur. 2d *Banks* §339 (1963).) Therefore, defendant contends that if the credit of the bond proceeds to the trustees' checking account was proper, forthright, customary, and lawful, Central could not have been unjustly enriched by an intermingling of the proceeds. Central contends that it acted properly in that it completely fulfilled the terms of the safekeeping agreement and any duties owed to the trustees by holding the bonds until maturity, collecting them, and then crediting the trustees' demand account at the Bank. Since the agreement provided that Central agreed to act "only as its depositor's collecting agent," the defendant maintains that its agency status terminated upon the collection of the proceeds, and that the relationship between it and the trustees became merely one of debtor and creditor. Thus, the credit to the trustees' demand account was a proper form of payment to the trustees,

and is recognized as such under general banking law and custom. The defendant cites as authority *Sheridan,* at 301-02; *Marine Bank of Chicago v. Rushmore* (1862), 28 Ill. 463; Ill. Rev. Stat. 1965, ch. 26, par. 4—201, 4—213; 10 Am. Jur. 2d *Banks* §338 (1963), and Restatement (Second) of Agency, Explanatory Notes §427, comment *a,* at 296 (1958).

The defendant argues that under the circumstances, all actions of the Bank were ratified as a matter of law, by the trustees. The defendant asserts that the law imposes upon a principal the affirmative duty to repudiate any unauthorized act of his agent, and a failure to repudiate such acts constitutes a ratification. *(Del Bianco & Associates, Inc. v. Adam* (1972), 6 Ill. App. 3d 286, 285 N.E.2d 480.) Further, a principal's long acquiescence with knowledge of the facts in an unauthorized act by his agent, amounts to a ratification of that act. *(Magid v. Drexel National Bank* (1947), 330 Ill. App. 486, 71 N.E.2d 898.) The defendant points out that an act so ratified becomes binding upon the principal as if it had been authorized, and contends that the trustees acquiesced in and failed to repudiate the Bank's act of crediting the proceeds to their checking account during the entire period that the funds remained on deposit and therefore ratified that act.

The defendant next argues that the plaintiff's alleged cause of action was barred by the 5-year limitation period of the applicable statute of limitations (Ill. Rev. Stat. 1971, ch. 83, par. 16). The alleged cause of action accrued when Central first credited the collected proceeds in May 1966 and notified the trustees; the amended complaint was not filed until February 1974. The defendant contends that the 10-year limitation for actions based upon written contracts or written evidence of indebtedness (Ill. Rev. Stat. 1965, ch. 83, par. 17) does not apply here, because the plaintiff's alleged cause of action is not based upon the terms of the agreement, but rather upon duties allegedly imposed by law upon the agent Bank.

The plaintiff receiver cross-appeals and contends that the proper measure of recovery is the entire amount of the earnings produced by the proceeds while on deposit in the trustees' checking account. According to the receiver, the applicable rules of law require that this be the measure of damages under the instant circumstances. The receiver argues that when an agent profits through or gains any advantage over the principal's property or funds, the agent must account to the principal because the relationship of principal and agent is fiduciary. *(People v. Riggins* (1956), 8 Ill. 2d 78, 132 N.E.2d 519.) Furthermore, all profits made and advantages gained by an agent in the execution of the agency belong to the principal whether or not the profit or the advantage is the result of the

performance of or in violation of the duty of the agency. (*East Peoria Elevator Co. v. Geo. W. Cole Grain Co.* (1958), 19 Ill. App. 2d 82, 153, N.E.2d 307.) The receiver concludes that the defendant should be liable for all profits produced from the proceeds. The defendant, of course, contends that if it is liable at all, recovery should be limited to the amount of interest that would have accrued to the amount deposited in a regular savings account from the date of the credit to the checking account until such time when the trustees had full knowledge of the placement of the funds.

We find that the defendant totally fulfilled its contractual obligations to the Plan trustees, and that it acted reasonably and in accordance with normal banking procedure under the circumstances. Therefore, the trial court erred in granting the plaintiff's motion for summary judgment. The defendant is not liable to the plaintiff for any interest that would have accrued or for any profits derived from the collected proceeds; the plaintiff's cross-appeal is without merit.

■■  It is a fundamental principle of banking law that the relationship between a bank and its depositor is created and regulated by the express or implied contract between them. (5 Ill. L. & Prac. *Banks* §181 (1953).) A bank and its depositor have the right to make their own contract, so long as it is not contrary to law or public policy. (10 Am. Jur. 2d *Banks* §338 (1963).) An agreement between the parties that the bank is to act merely as the depositor's agent for collection is binding upon the parties. (See *People ex rel. Russel v. Michigan Avenue Trust Co.* (1926), 242 Ill. App. 579, 595.) Such a binding agreement existed between Central and the Plan trustees; the safekeeping receipt clearly provided that Central would act "only as its depositor's collecting agent," with proceeds of collections to be disbursed in accordance with further instructions on record with the Bank. Of course, no such instructions were ever made available to Central.

■■■  Where a bank has received a deposit for collection, the bank's agency status terminates upon collection and credit to an account of the depositor. (*People ex rel. Nelson v. Sheridan Trust & Savings Bank* (1934), 358 Ill. 290, 300, 193 N.E. 186, 191; 5 Ill. L. & Prac. *Banks* §251 (1953).) Where collected funds are intermingled with general bank funds, a credit to the depositor's account has been held to be payment, and a debtor and creditor relationship then arises between the bank and the depositor. (*Sheridan*, at 301-02; *Marine Bank of Chicago v. Rushmore* (1862), 28 Ill. 463, 470; 5 Ill. L. & Prac. *Banks* §251 (1953).) In the instant case, the agency of Central terminated and its contractual obligations were fulfilled when Central collected the bond proceeds and made payment to the depositor trustees. A proper payment was made when the

amount of the proceeds was credited to the Plan account and when those funds became available to the trustees for withdrawal as of right. Ill. Rev. Stat. 1965, ch. 26, par. 4—213(4)(a).

■■ Central did not become unjustly enriched by the intermingling of the collected proceeds with general bank funds, because proper payment had been made to the trustees and a simple debtor-creditor relationship existed between the parties. According to the Restatement (Second) of Agency:

> "It may be understood that an agent who has collected money becomes a debtor to the principal for the amount collected (see §398), in which case he is not liable for the profits made by its use." (Restatement (Second) of Agency, Explanatory Notes §427, comment a, at 296-97 (1958).)

There is nothing to indicate that an agreement existed between the parties that the deposit by the trustees was a special deposit, and that any collected proceeds should therefore be kept separate from general bank funds. The character of a deposit is determined by the express or implied contract between the bank and the depositor, and a deposit is presumed to be general rather than special in the absence of a contrary agreement. (10 Am. Jur. 2d *Banks* §363 (1963).) Also, the fact that a deposit is made by one in a fiduciary capacity, or that the deposit consists of trust funds, does not make the deposit special, even where the bank is aware of the character of the deposited funds. (10 Am. Jur. 2d *Banks* §367 (1963).) Furthermore, here, the safekeeping receipt specifically provided that "All items are credited or cashed subject to final payment in cash or solvent credits."

■■■ The plaintiff insists that the Bank, following collection and in the absence of specific instruction, was required to unilaterally choose a form of investment for the trustees. The plaintiff seeks to impose upon the Bank duties and liabilities that it did not contract to undertake and perform. We believe that the Bank's position that it had neither the right nor the duty to unilaterally choose a new form of investment for the Plan funds and its decision to simply make an immediate payment in the form of a credit to the Plan account were both logical and legally well founded. It is elementary that "A bank does not become charged with the duties of a trustee merely because it accepts on deposit funds which are subject to a trust * * *." (10 Am. Jur. 2d *Banks* §367 (1963).) Furthermore, where, as here, the contract of the Bank was only to keep safe and redeem, it is not chargeable for interest for failure to do something further following the redemption and proper payment. (See *Mathewson v. Davis* (1901), 191 Ill. 391, 398, 61 N.E. 68, 71.) When the Bank's efforts to obtain further instructions from the trustees failed, the Bank was neither required to nor empowered to unilaterally select new investments, or to open new

accounts at Central for the trustees. The Bank reasonably requires that certain procedures and formalities be performed in order that new accounts may be opened, since, for example, the Bank later may incur liability if it acts without resorting to signature cards that should be on file for the verification of authorized signatures. (10 Am. Jur. 2d *Banks* §540 (1963).) Therefore, because the trustees did not comply with the required procedural formalities, Central was not obligated to, and in fact could not, perform these formalities for them. If Central had acted without authority and reinvested the bond proceeds, its act would not be sanctioned by law because the law requires that where trust funds are involved, investment authority and activity must be clearly stated and the authorized investing party must strictly conform to the specific investment powers. (See *In re Will of Hartzell* (1963), 43 Ill. App. 2d 118, 134, 192 N.E.2d 697, 705-06.) Banking law and practice support Central's good faith decision to make immediate payment to the trustees. According to one authority, it is fundamental that:

"If the party for whom [a] collection is made was a regular depositor the sum will be placed to his credit upon his regular deposit account, unless some peculiar usage or special instruction should demand a different course of dealing. * * * If the party has no deposit account, the bank simply owes him the amount on demand." (6 Michie on Banks and Banking, ch. 10, §38 (1952).)

And, further, that:

"In the absence of any general agreement, the custom of banks to credit customers with the proceeds of paper left for collection when the paper has been collected is universally recognized; customers and banks are presumed to contract in view of this usage. The law therefore authorizes the bank to credit the customer with the proceeds in lieu of making a specific delivery, and the necessary effect of an authorized credit is to create the relation of debtor and creditor between them from the time the credit is given." 10 Am. Jur. 2d *Banks* §741 (1963).

We have found that the Bank acted properly under the circumstances, that it was not unjustly enriched by its use of the deposited funds, and that the trial court erroneously granted plaintiff's motion for summary judgment. Therefore, we will not discuss the ratification question raised by the defendant and find that plaintiff's cross-appeal is without merit.

For the foregoing reasons, the judgment order of the circuit court of Cook County is reversed.

Reversed.

DIERINGER, P. J., and LINN, J., concur.