In re GOTHAM PROVISION COMPANY, INC., Debtor/Debtor in Possession.

The FIRST STATE BANK OF MIAMI, etc., Plaintiff,

v.

GOTHAM PROVISION COMPANY, INC., etc. et al., Defendants.

Bankruptcy No. 79–247–Bk–JAG–W.

United States Bankruptcy Court, S. D. Florida.

Oct. 26, 1979.

Timothy J. Norris, Miami, Fla., for Kilpatrick, Lykes & U.S. Sugar.

Earnest W. Dean, Jr., Tampa, Fla., for Lykes Bros., Inc.

R. Bruce Wallace, Jr., Miami, Fla., for the First State Bank of Miami.

Francis L. Carter, Miami, Fla., for Gotham Provision Co.

Rogers, Morris & Ziegler, Fort Lauderdale, Fla., for Waldrop Dairy, Inc. and W & D Dairy.

Sandler & Sandler, P.A., Miami, Fla., for Ronnie Perkins and Billie Rogers Farm.

Papy, Duval & Poole, Coral Gables, Fla., for Robbie Addison.

Don A. Lynn, Miami, Fla., for W.D. Roberts.

Eric Paul, Parkers and Stockyards Division, U.S. Dept. of Agriculture, Washington, D.C., for the United States.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDNEY M. WEAVER, Bankruptcy Judge.

THIS CAUSE having come on to be hard upon Plaintiff's Complaint to Establish Validity, Priority and the Extent of Lien and the Counterclaims and Crossclaims of the Defendants, and the Court, having heard the testimony and examined the evidence presented, having observed the candor and demeanor of the witnesses, having considered the arguments of counsel, and being otherwise fully advised in the premises, does hereby make the following findings of fact and conclusions of law:

This Court has jurisdiction of the parties and the subject matter.

Plaintiff, The First State Bank of Miami (the "Bank"), is a Florida banking corporation with its principal place of business in Dade County, Florida. The Defendant, Gotham Provision Company, Inc. (the "Debtor"), is a debtor under Chapter XI of the Bankruptcy Act continued in possession and is a Florida corporation with its principal place of business in Dade County. The remaining Defendants are individuals and corporations located throughout the State of Florida and engaged in the business of selling livestock.

This proceeding presents the conflicting claims by a bank claiming under a security agreement and by livestock sellers claiming under a federal statute to funds which represent the collections of accounts receivable of the Debtor which arose from the sale of meat products. This Court concludes that the livestock sellers are entitled to prevail.

Prior to the filing of its Chapter XI petition on March 9, 1979, the Debtor was engaged in the business of buying livestock for the purposes of slaughtering livestock and manufacturing and marketing meats and livestock products. On November 9, 1976, the Debtor and the Bank entered into a financing arrangement, duly perfected, under which the Bank would advance money to the Debtor with such advances to be secured by a lien on the Debtor's interest in its inventory and accounts receivable and the proceeds thereof. During the calendar year 1978, the Debtor began experiencing some financial difficulties, of which the Bank was aware, and these difficulties finally culminated in the filing of a Chapter XI petition by the Debtor on March 9, 1979. During the period of time from the end of February through March 16, 1979, the Debtor made substantial deposits in an account at the Bank which deposits were used to lower the Bank's loan balance from $450,000.00 to $112,324.19. Thereafter, at the request of the United States Department of Agriculture, this Court directed the Debtor to deposit future collections of accounts receivable in an escrow account at the Bank, and these funds totalled $74,439.85 as of the time of trial.

On April 20, 1979, the Bank instituted this adversary proceeding to determine the validity, priority and extent of its lien on the escrow fund. It joined as defendants the Debtor as well as D. R. Kilpatrick ("Kilpatrick"), Lykes Brothers, Inc. ("Lykes"), Ronnie Perkins ("Perkins"), W. D. Roberts ("Roberts"), Billie Rodgers Farm ("Rodgers"), United States Sugar Corporation ("U.S. Sugar"), W & D Dairy, Robbie Addison and W. Garcia. (Since W & D Dairy and W. Garcia failed to appear at the trial and prove their claims, they will not be considered further.) The Debtor filed an Answer admitting the allegations of the Bank's Complaint except to state that it was without knowledge of the relative priority of the other defendants vis a vis the Bank with respect to the escrow fund. The other defendants (the "livestock sellers") answered the Complaint alleging their prior interest to the escrow fund and further counterclaiming and crossclaiming against the Bank and the Debtor seeking recovery of the funds deposited with the Bank and used by the Bank to lower the loan balance. The amounts of their claims are:

| | |
|---|---|
| Kilpatrick | $121,431.39 |
| Lykes | 29,002.48 |
| Perkins | 10,000.27 |
| Roberts | 15,279.00 |
| Rodgers | 47,689.00 |
| U.S. Sugar | 34,880.63 |
| Addison | 1,560.00 |
| Total | $259,842.77 |

Under the Uniform Commercial Code, the Bank arguably would be entitled to keep all of the collected accounts receivable (at least those collected and deposited at the Bank prior to the filing of the Chapter XI petition on March 9, 1979), if the rationale of *DuBay v. Williams,* 417 F.2d 1277 (9th Cir. 1966) is followed. In *DuBay,* the Court held that a creditor secured by a floating lien on accounts receivable was not subject to preference attack with respect to the accounts receivable generated within four months of bankruptcy. Here, however, the Debtor in Possession (with the same powers as a bankruptcy trustee) has not sought to avoid the transfers on the basis of § 60 of the Bankruptcy Act, so there is no need to decide that issue. But, assuming that the Bank's security interest is valid and enforceable, the Bank still cannot prevail.

The livestock sellers base their claim to the funds held by the Bank on § 206 of the Packers and Stockyards Act, 1921, as amended, 7 U.S.C. § 196: *

(a) It is hereby found that a burden on and obstruction to commerce in livestock is caused by financing arrangements un-

---

* Lykes also has asserted a reclamation claim under either § 672.702(2) or § 672.507(2), Florida Statutes. While the Court finds that Lykes proved the factual elements of a right under those sections, the Court does not decide the legal issues of whether Lykes could prevail over the Bank and the Debtor, since it is not necessary to do so in light of this Court's ruling on the § 206 claim.

der which packers encumber, give lenders security interest in, or place liens on, livestock purchased by packers in cash sales, or on inventories of or receivables or proceeds from meat, meat food products, or livestock products therefrom, when payment is not made for the livestock and that such arrangements are contrary to the public interest. This section is intended to remedy such burden on and obstruction to commerce in livestock and protect the public interest.

(b) All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers: *Provided,* That any packer whose average annual purchases do not exceed $500,000 will be exempt from the provisions of this section. Payment shall not be considered to have been made if the seller receives a payment instrument which is dishonored: *Provided,* That the unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received, within thirty days of the final date for making a payment under section 409, or within fifteen business days after the seller has received notice that the payment has been dishonored, the seller has not preserved his trust under this subsection. The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary.

(c) For the purpose of this section, a cash sale means a sale in which the seller does not expressly extend credit to the buyer.

Section 206 was enacted as part of Public Law 94–410 and became law on September 13, 1976. The operative elements of the statute are in subsection (b): The buyer must be a packer as defined in the statute and must be purchasing livestock in cash sales. This packer must have average annual purchases in excess of $500,000.00, and

any unpaid cash seller seeking the benefits of the statute must give written notice to the packer and file the notice with the Department of Agriculture within thirty days of the final date for making payment under § 409 of the Packers and Stockyards Act.

Section 206 and the other amendments to the Packers and Stockyards Act enacted in 1976 showed Congress' recognition of and reaction to the perilous position of livestock producers and sellers, who often sell an entire year's production at one time. See the legislative history in (1976) U.S.Code Congressional and Administrative News, p. 2267. It is clear from the legislative history that the enactment of § 206 was intended specifically to prevent recurrence of the horrendous losses suffered by livestock sellers in the bankruptcy of American Beef Packers caused by the existence of a lending institution's liens on inventory, accounts receivable, and proceeds. It is equally clear from § 206(a) that the situation presented by this proceeding is the factual pattern anticipated by Congress, and the only way the Bank could prevail is if this Court would do what it will not do—ignore the clear legislative intent and unequivocal language of § 206. As the court stated in *In re Frosty Morn Meats, Inc.,* Case No. Bk 77–31707 (Bankr.Ct. M.D.Tenn. Aug. 31, 1978):

The language of (§ 206) together with its legislative history shows that what Congress had in mind in its enactment was (1) to establish a statutory trust in livestock purchased by a packer in cash sales, and inventories of, or receivables or proceeds derived therefrom, for the benefit of unpaid cash sellers until they had received payment in full; (2) to deny priority to a secured lender holding livestock, meat, meat food products, or receivables or proceeds therefrom, purchased by a packer in cash sales but which had not been paid for; (3) to eliminate specific identification of the livestock, carcasses, proceeds or receivables, but instead establish a trust pool for the benefit of the unpaid cash sellers, and (4)

to pre-empt State laws in conflict there-with.

See also In re Federal Packing Company of Florida, Case No. 78–1492 Bk CA–B, Adv. No. 1 (Bankr.Ct. S.D.Fla. April 23, 1979).

There has been no real dispute, and this Court finds, that the Debtor is a packer as defined by the Act and that its average annual purchases did exceed well over $500,000.00. In all instances save one there is no dispute that the product sold by the livestock sellers was indeed livestock; the Bank has asserted that Lykes sold meat products rather than livestock, but the evidence is clear and this Court so finds, that Lykes sold livestock to the Debtor (although it had a custom slaughter arrangement with the Debtor as well). This Court further finds that each of the livestock sellers filed sufficient notice with the Debtor and with the Secretary of Agriculture within the time periods prescribed by § 206 and established that the amounts due to each are the amounts claimed, set forth above.

The real issues in this adversary proceeding have been whether the sales of livestock upon which the livestock sellers are basing their claims are cash sales within the meaning of § 206(c) and to what extent the livestock sellers are required to trace their livestock to the ultimate point of collection of accounts receivable if they are to recover against the Debtor and the Bank. For the reasons discussed below, this Court concludes that all sales at issue in this adversary proceeding were cash sales and that the extent of tracing required of the livestock sellers is minimal and has been more than met.

The Bank has urged that the sales by the livestock sellers to the Debtor were on credit and thus are not entitled to the protection afforded to those who sell in cash sales. The gist of the argument is that the livestock sellers acquiesced in a course of conduct which amounted to an extension of credit by the livestock sellers or are estopped by their course of conduct from claiming that the sales of livestock were cash sales. The facts are undisputed that the livestock sellers—with the exception of Addison, whose dealings with the Debtor were few and far between—sold livestock to the Debtor more or less on a regular basis and that the Debtor rarely, if ever, complied with the prompt payment provisions of § 409 of the Act, 7 U.S.C. § 228b. However, the Court finds that the checks sent to the livestock sellers were not unreasonably late, with the possible exception of an isolated incident involving Kilpatrick, discussed below, which the Court finds is not dispositive of the issue. Moreover, there is no evidence that any of the livestock sellers—with the possible exception of Roberts—ever extended, orally or in writing, credit to the Debtor. The statute, in § 206(c), requires an express extension of credit if the sale is to be considered other than a cash sale, and this Court further holds, as a matter of fact and of law, that the course of conduct of these livestock sellers did not amount to an extension of credit, let alone an express extension of credit. See Fillippo v. S. Bonaccurso & Sons, Inc., 466 F.Supp. 1008 (S.D.Pa.1978); Hedrick v. S. Bonaccurso & Sons, Inc., 466 F.Supp. 1025 (E.D.Pa.1978). The Bank urges that Kilpatrick expressly extended credit in connection with one sale that occurred in the Fall of 1978. Whether Kilpatrick did so is irrelevant, because the evidence is clear that Kilpatrick did not extend credit for those sales involved herein and because the Fall, 1978 sale was an unusual transaction, thus not even within the scope of the Bank's "course of conduct" argument.

The Bank also argues that Roberts extended credit not only by his course of conduct but also by signing a letter dated September 26, 1978, the text of which reads:

On this date, I am entering into an agreement with Gotham Provision Company, Inc., authorizing them to pay for and mail checks in payment for cattle purchased from us as they have done in the past. This pertains to section 206 of the packers and stockyards regulations.

The most obvious defect in the Bank's argument is that the Roberts document states

nothing about extending credit, only about paying for cattle and mailing checks "as in the past." Since the course of conduct did not amount to an extension of credit, explicitly agreeing to the course of conduct should not constitute an extension of credit. Additionally, the writing does not comply with the United States Department of Agriculture's regulation governing the extension of credit in livestock sales, 9 C.F.R. § 201.200. This regulation requires clear language for an extension of credit and further requires that it be in writing and state that the livestock seller recognizes that he is waiving his rights under § 206. This Court finds that the writing signed by Roberts does not meet any of the minimal requirements of the regulation. Since this Court holds that the regulation is a statement of substantive law, a non-conforming writing cannot constitute an extension of credit. *See Hedrick v. S. Bonaccurso & Sons, Inc.,* 466 F.Supp. 1025 (S.D.Pa.1978); *In re Frosty Morn Meats, Inc.,* Case No. Bk 77–31707 (Bankr.Ct. M.D.Tenn. Sept. 14, 1978). Of course, this holding is an additional reason why the other livestock sellers cannot be considered to have extended credit to the Debtor in connection with the sales involved herein (or any other sales).

A principal of the Debtor, Helen Fischelmayer, testified that the sales involved herein were credit sales. However, her further testimony shows that her understanding of cash sale is not that set forth in the legislative history; rather, Mrs. Fischelmayer equated cash sales with C.O.D. sales. Of course, when the sales were made on a "grade and yield" basis (the grade and yield of meat realized from the livestock after their slaughter), it would be impossible to have C.O.D. sales. The Court also notes that Mrs. Fischelmayer has an interest in assisting the Bank, since she and her husband are liable to the Bank on personal guarantees of the Debtor's obligations to the Bank. This Court rejects her testimony that the sales were not cash sales.

Accordingly, this Court finds that the sales involved herein were cash sales within the meaning of § 206 and that the defendant livestock sellers are not estopped from asserting their positions as unpaid cash sellers. (The Bank raised other defenses to the livestock sellers' counterclaims, but those defenses are without merit in fact and in law.)

This contest between the Bank and the livestock sellers squarely presents the issue of what extent of tracing is required for the livestock sellers to prevail over the Bank. The testimony of Helen Fischelmayer was that the meat products derived from the livestock remain in identifiable form—by means of tagging—until the carcasses are cut into pieces smaller than halves. Then, the meat is commingled with other meat already in inventory. Mrs. Fischelmayer stated that it would be impossible to identify what account was created by the sale of meat products derived from livestock sold by any particular livestock seller, by sellers who clearly extended credit to the Debtor, or by meat products purchased from another packer. Mr. Robert Randall, an officer of the Bank, testified that the Bank had made no effort to distinguish the accounts receivable ultimately derived from livestock sold by the defendant livestock sellers and the accounts receivable ultimately derived from livestock sold on credit. Since the Bank's security interest was only in the Debtor's interest in inventory and accounts receivable and since the Bank presented no evidence on this issue, the Bank has failed to establish what accounts receivable are free of the trust imposed by § 206 and which are subject to it. Accordingly, it has not established a right to the proceeds of the accounts receivable with priority over the livestock sellers' rights.

Moreover, the evidence presented by the livestock sellers adequately traced the funds subject to the trust of § 206. *See In re Frosty Morn Meats, Inc.,* Case No. Bk 77–31707 (Bankr.Ct. M.D.Tenn. Aug. 31, 1978); *In re Federal Packing Company of Florida,* Case No. 78–1492 Bk CA–B, Adv. No. 1 (Bankr.Ct. S.D.Fla. April 23, 1979). We adopt the tracing test urged by the United States Department of Agriculture: The trust beneficiaries' sole burden is to

show that there existed a floating pool of commingled funds exceeding in dollar amount their total trust interests, and the floating pool includes not only the inventories of, or receivables or proceeds from meat, meat food products or livestock products derived from livestock purchased from the defendant livestock sellers on or after February 12, 1979 (the date of the earliest sale involved herein), but also includes inventories, receivables and proceeds on hand as of February 12, 1979, which had been derived from livestock purchased in cash sales. This Court finds that the escrow fund and the amounts used by the Bank to decrease the principal amount of the Debtor's loan are a part of that floating pool.

Even if a more stringent standard of tracing is applicable, the livestock sellers have met it. This Court finds from the evidence that the livestock sold by the defendant livestock sellers augmented the inventory by a much greater extent than livestock sold on credit and meat products purchased from packers, that the sales of inventory increased the amounts of accounts receivable, and that the collections of accounts receivable were deposited at the Bank, which used the deposits to lower its outstanding loan balance from $450,000.00 on February 28, 1979—which was the daily balance on every day since the Spring of 1978 except for several days during the Christmas and New Years holidays in December of 1978 and January, 1979. On March 9, 1979, the loan balance was $333,700.00, and on March 19, 1979, the balance was $112,324.19. Thereafter, the collections of accounts receivable were deposited in the escrow account pursuant to this Court's order. Accordingly, it is clear that the Bank received and retained in excess of $335,000.00 of accounts receivable which were subject to the § 206 trust.

■■ Under general principles of trust law, a person with actual or constructive knowledge of a trust takes funds from the trustee subject to the beneficiaries' claims. Scott, *The Law of Trusts* § 288 (3d ed. 1967). Here, the Bank had at least constructive knowledge of the trust, because the trust is created by federal statute. Furthermore, the Bank was aware that the Debtor was subject to regulation by the United States Department of Agriculture and did not make inquiry whether livestock sales were cash sales or on credit. Accordingly, even if the Bank did not have actual knowledge of the terms of § 206, it is bound by that statute.

Further principles of trust law provide that the commingling of trust funds with funds not subject to the trust results in a lien for the benefit of the beneficiaries on the commingled fund. This lien survives the transfer of the fund to a person, like the Bank, who has actual or constructive knowledge of the trust. Scott, *The Law of Trusts* §§ 291.4 and 519.1 (3d ed. 1967). Accordingly, the Bank is liable to the trust beneficiaries to the full extent of their claims. Of course, there is the additional $70,000.00 in the escrow account which is subject to the livestock sellers' claim as well.

■ One other minor issue was raised. The Bank has urged that Rodgers Farm, Inc. does not have a claim under § 206 because the livestock involved were actually sold by a partnership or sole proprietorship called Billie Rodgers Farm. However, there was evidence presented that Billie Rodgers Farm had assigned all of its accounts receivable to Rodgers Farm, Inc. This Court sees no reason why a claim under § 206 cannot be assigned nor why the assignee cannot perfect the claim. Furthermore, the Bank and the Debtor have made no showing that the assignment was prejudicial to either of them. Accordingly, this Court finds that Rodgers Farm, Inc. had a claim under § 206 which it has duly perfected.

As mentioned above, two of the livestock sellers joined as defendants by the Bank, W & D Dairy and W. Garcia, failed to appear at the trial and present evidence of their claims. In addition, Waldrep Dairy, Inc., while technically not joined by the Bank, also filed an answer to the Complaint and crossclaimed and counterclaimed against the Bank and the Debtor; however, Wal-

drep Dairy, Inc. failed to appear at the trial and present evidence. Accordingly, the Bank will prevail over their claims, and their counterclaims and crossclaims will be dismissed with prejudice.

A judgment will be entered in accordance with these findings and conclusions.