In re JACK–RICH, INC. dba
Diamond Meat Packers.

WEICHMAN PIG CO., et al., Plaintiffs,

v.

JACK–RICH, INC., et al., Defendants.

JACK–RICH, INC., Plaintiff,

v.

CARLINVILLE NATIONAL
BANK, Defendant.

Bankruptcy No. 94–70532.
Adv. Nos. 94–7047, 94–7054.

United States Bankruptcy Court,
C.D. Illinois.

Dec. 7, 1994.

Order Dec. 12, 1994.

R. Stephen Scott, Springfield, IL, for debtor.

Duane D. Young, Springfield, IL, for Cash Sellers.

Kathleen Miko, Washington, DC, and Fredric Benson, Springfield, IL, for Ashland Storage.

Jacqueline Brandenburg–Rees, Carlinville, IL, Director of Debtor.

Ronald L. Pallman, Belleville, IL, for Carlinville Bank.

Donald R. Tracy, Springfield, IL, for Farmers & Merchants.

## OPINION

LARRY L. LESSEN, Bankruptcy Judge.

Before the Court in Adversary No. 94–7047 is the Complaint for Declaratory, Injunctive and Other Relief of the Plaintiffs, referred to throughout these proceedings and herein as "the unpaid cash sellers". Before the Court in Adversary No. 94–7054 is the Second Amended Complaint of Jack–Rich, Inc. ("Jack–Rich"). These matters were consolidated for trial, and a trial was conducted on November 21, 1994.

Jack–Rich, a corporation owned by certain members of the Nejmanowski family, is the owner and operator of Diamond Meat Packers, a meat packing plant in Carlinville, Illinois. Jack–Rich is a packer, as defined by Section 201 of the Packers and Stockyards Act ("P & S Act"), 7 U.S.C. § 181 *et seq.*

On December 30, 1989, Jack–Rich and Richard Nejmanowski (as President of Jack–Rich and individually) executed a promissory note ("the Note") to Carlinville National

Bank ("CNB") for $500,000. The Note was secured by a real estate mortgage on Jack–Rich's meat packing plant and accompanying 65 acres, which had an appraised market value in 1989 of $875,000. The Note was payable on demand, but if no demand was made, then in monthly installments of $10,000.00.

The subject Note contains the following language:

SET–OFF: You have the right to set off any amount I owe you under this note against any right I have to receive money from you. If my right to receive money from you is owed by someone else not paying this note, your set-off can only reach funds I could have reached with my own request or endorsement. Your right of set-off does not extend to accounts where my rights are only as a fiduciary. It also does not extend to my IRA or other tax-deferred retirement accounts.

Your right of set-off applies without your first telling me you are going to use it. It applies no matter what sort or value of collateral is on this loan. It also applies no matter who else has agreed to pay this note.

You will not be liable for wrongful dishonor of a check where such dishonor occurs because you set-off this debt against my account.

. . . .

REMEDIES: If I am in default on this note, you have the following remedies:

. . . .

(2) You may set-off this debt against any right I have to the payment of money from you.

Throughout the years 1990, 1991, and 1992, payments on the loan were regular, but were frequently one payment past due. Around January 1, 1993, the parties agreed to lower the monthly note payments from $10,000 to $5,000. After that, payments were regularly made, but again, were often one payment past due. In spite of this, the loan was never declared in default or declared due.

On or about December 10, 1993, a special meeting of the Board of Directors of Jack–Rich was held, at which Del Nejmanowski ("Del") and his daughter, Jacqueline Brandenburg–Rees ("Jackie") were present. At that meeting, Richard "Rick" Nejmanowski, brother of Jackie and son of Del, was terminated as President of Jack–Rich, and Del was elected President.

In the morning of Friday, December 24, 1993, a meeting occurred at CNB between Del, Jackie, James W. Ashworth, President and C.E.O. of CNB, and Shawn Davis, Vice-President of CNB. At that meeting, which lasted between 15 and 30 minutes, it was explained that Del had been elected President of Jack–Rich, had taken control of the day-to-day operations, and had fired Rick, in part because Rick had failed to pay suppliers in a timely manner. Jackie testified that she stated in the meeting that Rick had not been in compliance with certain provisions of the P & S Act and that the Packers and Stockyards Administration ("P & S Administration") could shut down the packing operation for failure to comply with these provisions. Del testified that he expressly stated in the meeting that livestock sellers had to be paid within twenty-four hours. Jackie also remembered stating in the meeting that another reason Rick had been terminated was that he had been regularly paying over the market price for hogs. Notes prepared by Shawn Davis regarding the December 24, 1993 meeting stated as follows:

Delbert Nejmanowski and Jackie Brandenburg–Rees were in a meeting with James Ashworth and Shawn Davis explaining the change in management of Diamond Meat Packers. At that time they explained that the President of the Corporation, being Rick Nejmanowski had been voted out by the shareholder's (sic) and that Del had been voted in as the new President. Rick was removed due to past losses and the fact that he had allowed unsecured providers of livestock to go unpaid in direct violation of federal law. . . .

At some point during the meeting, Del advised that he wanted to open a commercial checking account, and removed a handful of checks from his pocket. Mr. Ashworth testified that he understood that the funds to be deposited into the account would be the proceeds from the sale of meat, and Del testified

that he expressly stated during the meeting that he was opening the account for the purpose of paying livestock sellers.

Mr. Ashworth advised Del and Jackie about the "hold" on checks deposited into the account but drawn on other banks. The parties understood that the funds must be collected by CNB in order to be available for withdrawal.

At the conclusion of the meeting, Mr. Ashworth introduced Del to the new accounts representative of CNB and the checking account was opened. The 22 checks deposited on December 24, 1993 totalled $325,072.38. Del was presented with and signed a Notice of Delayed Availability, indicating that $61,-825.67 would be available for withdrawal on December 29, and $263,246.61 would be available on December 31. The factor determining when the "hold" would be lifted on individual deposit items is the distance required in order to route each item through commercial collection channels. At no point during the December 24, 1993 meeting was there any discussion of any matter pertaining to the Note.

Later in the day on December 24, Kym Nejmanowski, wife of Del, Secretary to the President and Office Manager of Jack–Rich, testified that she stopped into CNB to transact some business of her own. While there, she stopped in Mr. Ashworth's office to say hello and to wish him happy holidays. She recalled stating that her holiday would be better if the P & S Administration was not at the Jack–Rich plant. On rebuttal, Mr. Ashworth testified that he had no recollection of this conversation, and stated that he did not know that the P & S Administration was on the premises at the Jack–Rich plant on December 24.

Mr. Ashworth testified that on Monday, December 27, 1993, he was advised by a third-party that the P & S Administration was on the property at Jack–Rich.

Also on December 27, 1993, Del deposited into the newly-opened commercial checking account at CNB third-party checks totalling $54,522.27, although this deposit was not posted until the following day. The total of

the December 24 deposit and the December 28 deposit was $379,594.65.

On Tuesday, December 28, 1993, Mr. Ashworth testified that he had a conversation with Del and Ed Rees wherein he was told that representatives of the P & S Administration were at the plant, and that CNB was to provide the representatives with any information requested and otherwise provide full cooperation.

Later in the day of Tuesday, December 28, 1993, CNB unilaterally transferred $379,-594.65 from Jack–Rich's account and applied that sum to the outstanding principal balance of the Note, which was $387,310.25. Mr. Ashworth testified that between December 24 and December 28, CNB had had time to reflect on certain matters, including the change in management at Jack–Rich and the presence of the P & S Administration at the Jack–Rich plant. Shawn Davis' notes from that date state in part as follows:

> We were once again asked to cooperate with government staff if they requested any and all bank records. At that time the situation was discussed between James Ashworth and John Dowland regarding status of past due loans and the uncertainty presented by the government personnel from the Packers and Stockyards Administration which might create the collection of our real estate loan in uncertainty (sic). It was decided at that time because of the continued delinquency of the loan and the uncertainty created by management change to deem this loan in default and demand this loan in full. We, at that time, set off the account with any and all funds that were held on deposit at this bank which left a principal balance remaining on this note of $10,421.27. The officers of the corporation were then notified of the set-off and our decision to place this note into demand status and requesting payment in full.

No previous notice was given, nor was the note called due at the time of the setoff.

An involuntary Chapter 7 proceeding was filed against Jack–Rich on March 25, 1994, which Jack–Rich sought to, and was allowed to convert to a Chapter 11. These adversaries were filed in April, 1994. Through its

pleadings and arguments before the Court, Jack–Rich has made numerous arguments for setting aside the December 28, 1993 setoff, the most important of which are as follows:

(i) The setoff was in direct violation of the terms of the Note for the following reasons:

(a) The terms of the Note preclude setoff of funds held as a fiduciary. According to Jack–Rich, the funds deposited and subsequently setoff were held in trust for the benefit of the unpaid cash sellers pursuant to provisions of the P & S Act.

(b) The terms of the note restrict setoff to funds which could have been reached by Jack–Rich's request or endorsement. According to Jack–Rich, the fact that the deposits were subject to a "hold" at the time they were set off made the set off in violation of the terms of the Note.

(ii) The setoff was in violation Section 206 of the P & S Act (7 U.S.C. § 196).

■ On the issue of the terms of the Note, relevant portions of which are set forth above, the Court views this as a simple contract matter. Courts will enforce a contract as written by the parties unless the contract is contrary to public policy. *National Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 362 (7th Cir.1987), citing *Matusek Academy of Music, Inc. v. National Surety Corp.*, 210 F.2d 333, 337 (7th Cir.1954); *Severs v. Country Mutual Ins. Co.*, 89 Ill.2d 515, 520, 61 Ill.Dec. 137, 139, 434 N.E.2d 290, 292 (1982); *Hancock v. National Council, K.L.S.*, 303 Ill. 66, 73, 135 N.E. 33, 35 (1922). The applicable Illinois rule is as follows:

Parties competent to contract may enter into such agreements with each other as they see fit and it is the purpose of the law and function of the court to enforce their contract, if not in violation of law or opposed to public policy. Courts do not make contracts for parties who are fully capable of making their own agreements. . . .

*National Fidelity* 811 F.2d at 362, citing *Matusek*, 210 F.2d at 337 (quoting *Hancock*, 303 Ill. at 73, 135 N.E. at 35). Banks and depositors have the right to make their own

contract if it is not contrary to law or public policy. *Bieze v. Coca*, 54 Ill.App.3d 7, 11 Ill.Dec. 652, 369 N.E.2d 106 (1st Dist.1977). Courts must construe the meaning of a contract by looking at words used and cannot interpret the contract in a way contrary to the plain and obvious meaning of these words. *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome*, 194 Ill.App.3d 744, 141 Ill.Dec. 347, 551 N.E.2d 340 (Ill.App. 1 Dist.1990), citing *Johnstowne Centre Partnership v. Chin*, 99 Ill.2d 284, 287, 76 Ill.Dec. 80, 81, 458 N.E.2d 480, 481 (1983). An instrument will be most strongly construed against the party who prepared it. *Bankier v. First Fed. Sav. & Loan Assoc.*, 225 Ill. App.3d 864, 167 Ill.Dec. 750, 588 N.E.2d 391 (Ill.App. 4 Dist.1992), reh. den'd (March 31, 1992), and app. den'd *Bankier v. First Fed. Sav. & Loan Ass'n*, 146 Ill.2d 622, 176 Ill. Dec. 792, 602 N.E.2d 446 (1992).

■ As quoted above, the Note states in part: "Your right of setoff does not extend to accounts where my rights are only as a fiduciary." Nowhere in the language found in the Note does it state that CNB must be placed on actual notice that funds in question are held only as a fiduciary. In fact, nowhere is there even the slightest ambiguity; the right of set-off is restricted to funds not held as a fiduciary, period. The Court believes, based upon its resolution of certain other issues herein and the representations of the parties at trial, that it is undisputed that the funds set off on December 28, 1993, were subject to the trust fund claims of the unpaid cash sellers. In order to clarify the issue, the Court specifically finds that said funds were trust funds for the benefit of the unpaid cash sellers under and pursuant to the terms of the P & S Act. Accordingly, the purported setoff was in violation of the terms of the Note. Therefore, the Court finds it unnecessary to reach the issue of whether the fact that the funds set off were subject to a "hold" precluded CNB from legally setting off under the terms of the Note.

■ Although the plain language of the parties' contract is dispositive of the issue, CNB's December 28, 1993 setoff was also

wrongful in that it was in violation of Section 206 of the P & S Act. Section 196(b) reads as follows:

> All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers. . . .

The parties acknowledge conflicting authority on the question of to what extent actual knowledge of the trust is required in order for the unpaid cash sellers' claim to supersede that of CNB. In *In re Gotham Provision Co., Inc.*, 1 B.R. 255 (Bankr. S.D.Fla.1979), aff'd 669 F.2d 1000 (5th Cir. 1982), a case brought under the P & S Act, the Court held that the creditor "had at least constructive knowledge of the trust, because the trust is created by federal statute. Furthermore, the Bank was aware that the Debtor was subject to regulation by the United States Department of Agriculture and did not make inquiry whether livestock sales were cash sales or on credit." *Id.* at 261.

■ Under this analysis, which this Court embraces, a non-trust claimant is not required to be placed on actual notice in order to be bound by the statutory scheme creating the trust for the benefit of third parties. Here, CNB's action was clearly in violation of the P & S Act when it set off the subject funds. CNB was imparted with constructive knowledge of the trust because the trust was created by federal statute. Additionally, CNB was aware that Jack–Rich was subject to regulation by the P & S Administration and therefore the U.S. Department of Agriculture, yet CNB did not inquire as to the legal ramifications of this regulation. Under *Gotham*, no further inquiry is required in order for the Court to conclude, as it does here, that the subject setoff was in violation of the P & S Act.

The Court acknowledges another line of cases which imposes a less stringent standard of inquiry on the part of creditors in CNB's position. See *C.H. Robinson Co. v. B.H. Produce Co., Inc.*, 723 F.Supp. 785 (N.D.Ga.1989). In *Robinson*, which was brought under a different but legally parallel statutory scheme known as the Perishable Agricultural Commodities Act ("PACA"), the court concluded, following *Gotham*, that lenders with actual or constructive knowledge of a PACA trust must refund any monies they received which would otherwise be property of that trust. The court disagreed with the holding in *Gotham* only on the question of when knowledge is to be imputed to a lender. As stated above, the *Gotham* court stated that knowledge is imputed because of the existence of the statute; the *Robinson* court held, however, that knowledge is to be imputed (i) when the lender has a lien on PACA trust property, or (ii) when "there are circumstances such that the person should know that money was derived from the sale of trust property." *Id.* at 793. On the question of knowledge, the *Robinson* court was clear in that its standard required actual knowledge of the trust in order to allow recovery by the beneficiaries of the trust.

■ This Court finds that CNB had actual knowledge of the existence of the trust as well as actual knowledge that the subject funds were derived from the sale of trust property. Mr. Ashworth admitted that he understood that the funds to be deposited into the account would be the proceeds from the sale of meat. Mr. Davis' notes from the December 24, 1993 meeting make direct reference to "the fact that (Rick) had allowed unsecured providers of livestock to go unpaid in direct violation of federal law." Jackie (who counsel for CNB referred to at trial as "the most impartial witness") testified that she recalled stating in the December 24, 1993 meeting that Rick had not been in compliance with certain provisions of the P & S Act and that the P & S Administration could shut down the packing operation for failure to comply with these provisions. In addition, Jackie recalled explaining in detail during the December 24, 1993 meeting the reason why Rick had been forced to pay higher than market price for hogs on a regular basis.[1]

---

1. Jackie's testimony was that Rick had to pay higher than market price for hogs in order to keep a steady flow of cash from sales coming into the operation in order to keep current on his

These facts, taken together, clearly show actual knowledge on the part of CNB of the existence of the trust as well as actual knowledge that the subject funds were trust property.

██ Significantly, it is clear from the chronology of events that the presence of the P & S Administration at the Jack–Rich plant was the precipitating event which caused CNB to set off the subject funds. There had been no discussion of any problems with the Note at the meeting held four days earlier. The Note had never been declared in default or declared due. According to the 1989 appraisal, the market value of the real estate was more than twice the amount remaining due on the Note. Payments on the Note were never seriously in arrears. These elements, viewed in conjunction with the statements made (and memorialized by Mr. Davis) regarding the failure to pay suppliers of livestock "in direct violation of federal law. . . ." indicate that CNB knew when it set off the account on December 28 that the funds being set off were subject to a possible claim of right by the P & S Administration or persons on whose behalf the P & S Administration may act. The fact that CNB may not have known about the precise statutory scheme of the P & S Act is not instructive. Mere ignorance of its existence is insufficient to defeat the trust rights of the claimants protected thereunder. *In re Richmond Produce Co., Inc.,* 112 B.R. 364 (Bankr.N.D.Cal. 1990).

██ As a final matter, CNB has argued in the alternative that, because the amount set off exceeded the amount of any possible trust for the benefit of unpaid cash sellers by the difference of $379,594.65 (the amount set off) and $305,701.97 (the valid trust fund claims), or $73,892.68, the most CNB should be required to disgorge is $305,701.97.

Section 206 of the P & S Act, *supra,* states that *all* proceeds from the sale of meat shall be held in trust for the benefit of all unpaid cash sellers until full payment has been received by such unpaid sellers (emphasis added). There has been no showing that the funds on deposit with CNB were anything other than meat sale proceeds. The Court believes that the statute is clear and that the entire amount set off must be disgorged for the benefit of the trust fund claimants. The unpaid cash sellers have requested interest and attorneys fees, and these questions, along with CNB's rights with respect to any surplusage, will be determined at a later date.

For the reasons set forth above, CNB is ordered to disgorge the sum of $379,594.65 to Jack–Rich. Jack–Rich is ordered to hold the entire $379,594.65 in its escrow account in trust for the benefit of the unpaid cash sellers until further order of this Court.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

### *ORDER*

Pursuant to the Opinion of this Court entered December 7, 1994, and the Findings of Fact and Conclusions of Law contained therein, after the consolidated trial of these two adversary matters, the Court orders as follows:

1. That the Motion for Summary Judgment filed by Jack–Rich in Adversary No. 94–7054 on November 10, 1994, be and is hereby denied.

2. That judgment is entered in Adversary No. 94–7054 in favor of Jack–Rich and against Carlinville National Bank pursuant to Counts III and V of Jack–Rich's Second Amended Complaint. Counts I, II, and IV of Jack–Rich's Second Amended Complaint are dismissed as moot. Carlinville National Bank's affirmative defenses are denied.

3. That Judgment is entered in Adversary No. 94–7047 in favor of the unpaid cash sellers and against Carlinville National Bank pursuant to the Complaint of the unpaid cash sellers.

payments to suppliers. Because it was required that suppliers of livestock be paid within twenty-four hours, and because Rick was not in the habit of maintaining sufficient cash reserves in

order to timely pay the suppliers, Rick was forced to move a steady supply of meat through the packing plant so as to keep a steady supply of cash coming in.

4. That judgment is entered in Adversary No. 94–7047 in favor of Jack–Rich and against Carlinville National Bank pursuant to Counts III and V of the Counterclaim [which the Court construes to be a cross-claim brought pursuant to Fed.R.Bankr.P. 13(g) ] of Jack–Rich. Counts I, II and IV of Jack–Rich's Counterclaim are dismissed as moot.

5. That the Carlinville National Bank be and is hereby ordered to pay to Jack–Rich the entire amount of the December 28, 1993, setoff from Jack–Rich's account in the amount of $379,594.65.

6. That Jack–Rich be and is hereby ordered to hold the entire $379,594.65 in trust and in an escrow account for the benefit of the unpaid cash sellers (being the Plaintiffs, including realigned party plaintiffs, in Adversary No. 94–7047) until further order of this Court.

7. That the issues of interest and attorneys' fees requested by the unpaid cash sellers, and interest requested by Jack–Rich pursuant to its account agreement with Carlinville National Bank, and the issue of Carlinville National Bank's claim of right to any surplusage remaining after payment of the cash sellers be and is hereby reserved for further hearing by the Court.