In re GOTHAM PROVISION COMPANY, INC., Debtor/Debtor in Possession,

The FIRST STATE BANK OF MIAMI, Appellant,

v.

GOTHAM PROVISION COMPANY, INC., et al., Appellees.

No. 80–5682.

United States Court of Appeals, Fifth Circuit.* Unit B

March 11, 1982.

Rehearing Denied May 13, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Taylor, Brion, Buker & Greene, Robert J. Paterno, James Carl Pilkey, Miami, Fla., for appellant.

Mershon, Sawyer, Johnston, Dunwody & Cole, Timothy J. Norris, Miami, Fla., for appellees.

Papy, Poole, Weissenborn & Papy, Sheridan Weinstein Weissenborn, Coral Gables, Fla., for Robbie Addison.

Anthony J. Steinmeyer, Al J. Daniel, Jr., Civ. Div., U. S. Dept. of Justice, James M. Kelly, Atty., Dept. of Agriculture, Washington, D. C., for amicus curiae (U. S.).

Shutts & Bowen, Don A. Lynn, Miami, Fla., for W. D. Roberts.

Broad & Cassel, Martin L. Sandler, Miami, Fla., for Ronnie Perkins and Rogers Farm, Inc.

Before MORGAN, TJOFLAT and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

This appeal presents the first opportunity for a court of appeals to construe the trust provisions of the 1976 amendments to the Packers and Stockyards Act of 1921 ("the Act"), 7 U.S.C.A. § 181 *et seq.* (West 1980). In the aftermath of numerous bankruptcies of meat packers in the early 1970's, Congress amended the Packers and Stockyards Act to provide certain livestock producers with some means to ensure that they would receive payment for livestock sold to packers. Section 206 of the amended Act, 7 U.S.C.A. § 196 (West 1980),[1] requires that

---

1. Section 206 of the Packers and Stockyards Act, 7 U.S.C.A. § 196 (West 1980), reads as follows:

(a) It is hereby found that a burden on and obstruction to commerce in livestock is caused by financing arrangements under which packers encumber, give lenders security interest in, or place liens on, livestock purchased by packers in cash sales, or on inventories of or receivables or proceeds from meat, meat food products, or livestock products therefrom, when payment is not made for the livestock and that such arrangements are contrary to the public interest. This section is intended to remedy such burden on and obstruction to commerce in livestock and protect the public interest.

(b) All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food prod-

packers who purchase livestock on a cash basis hold such livestock and accounts receivable and proceeds derived from the resale of the livestock in trust for the benefit of unpaid cash sellers.

This case arose from the financial demise and bankruptcy of Gotham Provision Co., Inc. ("Gotham"), a meat packer. The First State Bank of Miami ("the Bank") entered into a financing arrangement with Gotham on November 9, 1976, whereby the Bank would advance funds to Gotham and take as collateral a security interest in Gotham's inventories, accounts receivable and proceeds from the sale of meat. Gotham's financial fortunes turned for the worse in 1978; the Bank was aware of Gotham's financial problems. Ultimately, Gotham filed a Chapter XI petition in bankruptcy on March 9, 1979. Approximately one month prior to the filing of the bankruptcy petition, the outstanding balance due to the Bank on the Gotham loan was $450,000, and, by March 16, 1979, seven days after the filing of the bankruptcy petition, this amount was reduced to $112,324.19. At that time, the bankruptcy judge, at the request of the United States Department of Agriculture ("USDA") ordered that all future collections of accounts receivable be held in escrow. This escrow account contained $74,439.85 at the time of the trial in the bankruptcy court below.

Several livestock producers who had allegedly made cash sales of cattle to Gotham during February, 1979, were left unpaid, and they notified Gotham and the Secretary of Agriculture ("Secretary") of their intent to preserve their rights under the trust provisions of the Packers and Stockyards Act. The Bank thereafter instituted an adversary proceeding in the bankruptcy court to determine the validity, priority and extent of the lien it claimed on the escrow account by virtue of its security interest in the accounts receivable. The Bank named Gotham and certain livestock producers, including D. R. Kilpatrick ("Kilpatrick"), Lykes Brothers, Inc. ("Lykes"), Ronnie Perkins ("Perkins"), W. D. Roberts ("Roberts"), Billie Rogers Farm ("Rogers"), United States Sugar Corporation ("U. S. Sugar"), Robbie Addison ("Addison"), W & D Dairy and W. Garcia as defendants. The latter two defendants did not make an appearance in the bankruptcy court, and their claims to the escrow account were extinguished by the bankruptcy judge. The other defendants answered by alleging that the trust provisions of the Packers and Stockyards Act gave them priority over the escrow funds. In addition, they filed a counterclaim against the Bank to recover the additional amounts necessary to compensate them fully for the cash sales of cattle made to Gotham on the theory that the funds used to decrease Gotham's loan balance were subject to the trust created by § 206 of the Packers and Stockyards Act.

The bankruptcy judge held that the livestock producers were cash sellers as defined by the Act and were thereby entitled to the protection of § 206. The judge further held that the floating pool of trust assets to which these producers held a valid claim included both the escrow account and the money used to decrease Gotham's debt to the Bank. Thereby, the bankruptcy judge ruled that the producers had priority over the escrow funds and that they should recover against the Bank on their counterclaims. The district court affirmed.

---

ucts, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers: *Provided,* That any packer whose average annual purchases do not exceed $500,000 will be exempt from the provisions of this section. Payment shall not be considered to have been made if the seller receives a payment instrument which is dishonored: *Provided,* That the unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received, within thirty days of the final date for making a payment under section 228b of this title, or within fifteen business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection. The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary.

(c) For the purpose of this section, a cash sale means a sale in which the seller does not expressly extend credit to the buyer.

On appeal to this court, the Bank raises several claims of error. First, it argues that the court below erred by holding that the livestock producers were cash sellers. Second, the Bank argues that even if the producers are cash sellers, the statute should not be construed to allow these producers to have priority over the Bank's security interest in the accounts receivable and to force the Bank to remit to them moneys derived from the accounts receivable which had been applied to reduce Gotham's debt to the Bank. Finally, the Bank argues that certain parties should not be permitted to take advantage of the trust provisions of the Act since these parties did not properly file their claims in accordance with the Act. We reverse the judgment below pertaining to appellee Perkins and remand for further findings on the filing issue. We reject each of the other arguments raised by the Bank and therefore affirm with respect to all other appellees.

## I. CASH SALES VERSUS CREDIT SALES

Congress clearly limited the application of the trust provisions of § 206 of the Packers and Stockyards Act to transactions where:

(1) The commodities sold are "livestock," as defined in § 2(a) of the Act, 7 U.S.C.A. § 182 (West 1980);

(2) The purchaser of the livestock is a "packer" as defined in § 201 of the Act, 7 U.S.C.A. § 191 (West 1980);

(3) The transaction is a "cash sale";

(4) The cash sellers have not received full payment for their livestock;

(5) The packer in question makes average annual purchases of more than $500,000; and

(6) The cash sellers have preserved the trust within the required period by giving notice to the packer and by filing that notice with the Secretary of Agriculture. Where each of these conditions has been satisfied, the packer is required to hold in trust for the benefit of unpaid cash sellers any livestock purchased in cash sales, inventories of meat or other products derived from such livestock, and accounts receivable or proceeds obtained through the sale of these items by the packer.

■ The Bank's first argument is that the § 206 trust does not arise in this case because the transactions in question in this case are not cash sales. We find this assertion to be without merit. The Act itself provides specific guidance for the determination of whether a transaction is a cash sale. Subsection (c) of § 206 defines a "cash sale" to be "a sale in which the seller does not *expressly* extend credit to the buyer." 7 U.S.C.A. § 196(c) (West 1980) (emphasis added). Section 206 itself does not indicate what constitutes an express extension of credit, but § 409 of the Act, 7 U.S.C.A. § 228b (West 1980) provides some assistance.[2] Section 409 requires that pur-

2. Section 409 of the Act, 7 U.S.C.A. § 228b (West 1980), provides:

(a) Each packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized representative the full amount of the purchase price: *Provided,* That each packer, market agency, or dealer purchasing livestock for slaughter shall, before the close of the next business day following purchase of livestock and transfer of possession thereof, actually deliver at the point of transfer of possession to the seller or his duly authorized representative a check or shall wire transfer funds to the seller's account for the full amount of the purchase price; or, in the case of a purchase on a carcass or "grade and yield" basis, the purchaser shall make payment by check at the point of transfer of possession or shall wire transfer funds to the seller's account for the full amount of the purchase price not later than the close of the first business day following determination of the purchase price: *Provided further,* That if the seller or his duly authorized representative is not present to receive payment at the point of transfer of possession, as herein provided, the packer, market agency or dealer shall wire transfer funds or place a check in the United States mail for the full amount of the purchase price, properly addressed to the seller, within the time limits specified in this subsection, such action being deemed compliance with the requirement for prompt payment.

chasers of livestock pay the seller the full amount of the purchase price before the close of the next business day following the purchase and transfer of possession of the livestock, or, if the transaction is on a "grade and yield" basis, before the close of the next business day following the determination of the purchase price.[3] However, § 409(b) allows the parties to effect payment in another manner so long as the parties expressly agree in writing, in accordance with the terms and conditions specified by the Secretary of Agriculture, to such a financing arrangement. In essence, § 409 of the Act presumes that all livestock sales are cash sales unless the parties expressly agree in writing to make the transaction a credit sale. Read in this context, the language of § 206 defining "cash sales" to include all sales where the seller has not expressly extended credit contemplates that unless the parties clearly agree in writing to a credit arrangement, the transaction is a cash sale.[4]

The legislative history of the 1976 amendments supports this view. The Senate Committee on Agriculture and Forestry recognized that § 409 would be critical to determining whether a transaction was a cash or credit sale. Discussing the statutory provision found in § 409(a) allowing the parties to modify in writing the terms of payment established in § 409(a), the Committee stated:

> Nothing in section 7 would preclude a packer and a producer from agreeing in writing that the packer may transmit through the mails, by the close of the next business day, payment for livestock purchased. Such action would not result in the producer being considered a credit seller. If, however, the agreement is for payment beyond the close of the next business day, the producer would be considered a credit seller and as such would forfeit his rights under the trust.

S.Rep. No. 932, 94th Cong., 2d Sess. 12, *reprinted in* [1976] U.S.Code Cong. & Ad. News 2267, 2278. Since the "agreements" referred to in this excerpt are required by § 409(b) to be in writing, Congress clearly intended that a writing specifying terms of payment which extended beyond the time allowed in § 409(a) would establish that the transaction is a credit sale. Likewise, where the parties made no such writing, payment would be due within the two-day period specified in § 409(a), and the transaction would thereby be a cash sale. The existence of a writing which merely provides that payment may be made by mailing a check to the seller within the § 409(a) time period would not, as the legislative history notes, transform a cash sale into a

(b) Notwithstanding the provisions of subsection (a) of this section and subject to such terms and conditions as the Secretary may prescribe, the parties to the purchase and sale of livestock may expressly agree in writing, before such purchase or sale, to effect payment in a manner other than that required in subsection (a) of this section. Any such agreement shall be disclosed in the records of any market agency or dealer selling the livestock, and in the purchaser's records and on the accounts or other documents issued by the purchaser relating to the transaction.

(c) Any delay or attempt to delay by a market agency, dealer, or packer purchasing livestock, the collection of funds as herein provided, or otherwise for the purpose of or resulting in extending the normal period of payment for such livestock shall be considered an "unfair practice" in violation of this chapter. Nothing in this section shall be deemed to limit the meaning of the term "unfair practice" as used in this chapter.

3. "Grade and yield" purchases may be distinguished from "live weight" purchases in that in the former transaction, the purchase price is not determined until the cattle are slaughtered and the yield of meat from the carcass is graded and weighed, whereas in the latter, price is based upon the gross weight of the cattle at the time of purchase. Grade and yield purchases would therefore carry a higher price per pound. This statutory proviso accounts for the necessary delay in fixing the "grade and yield" price.

4. Two opinions written by Judge Hannum have reached the same conclusion. *See Fillippo v. S. Bonaccurso & Sons, Inc.*, 466 F.Supp. 1008, 1020 (E.D.Pa.1978); *Hedrick v. S. Bonaccurso & Sons, Inc.*, 466 F.Supp. 1025, 1032 (E.D.Pa. 1978).

credit sale because such an agreement is not an ·extension of credit.[5]

Other passages in the legislative history support the rule that an extension of credit exempt from trust protection must be in writing. Rep. Poage, the chairman of the House Committee on Agriculture's Subcommittee on Livestock and Grains, explained in his opening remarks on the floor of the House that if a livestock producer intends to enter into a credit arrangement, "he has to *write it out* so he can fully understand that he is not going to be paid until a certain date." 122 Cong.Rec. 12862 (May 6, 1976) (emphasis added). In addition, Rep. Thone, the principal sponsor of the 1976 amendments, in responding to a question from one congressman regarding whether packers could continue the practice of orally agreeing with producers for payment to occur at a time after the next business day after the purchase and then pledging the accounts receivable from the sale of the meat to a bank, stated that:

**5.** An example of such an agreement to authorize payment by check through the mails is found in the following agreement between appellee Roberts and Gotham:

> On this date, I am entering into an agreement with Gotham Provision Company, Inc., authorizing them to pay for and mail checks in payment for cattle purchased from us as they have done in the past. This pertains to section 206 of the packers and stockyards regulations.

Plaintiff's Exhibit 18. This agreement does not expressly extend credit and thereby does not constitute evidence of a credit transaction.

**6.** 9 C.F.R. § 201.200 provides:

> (a) No packer whose average annual purchases of livestock exceed $500,000 shall purchase livestock on credit, and no dealer or market agency acting as an agent for such a packer shall purchase livestock on credit, unless: (1) Before purchasing such livestock the packer obtains from the seller a written acknowledgment as follows:
>
> On this date I am entering into a written agreement for the sale of livestock on credit to ——————, a packer, and I understand that in doing so I will have no rights under the trust provisions of section 206 of the Packers and Stockyards Act, 1921, as amended (7 U.S.C. 196, Pub.L. 94–410), with respect to any such credit sale. The written agreement for such selling on credit
> Covers a single sale.

[T]here is a provision in this legislation which clearly allows that practice to continue. If they want to agree on payment a week from Monday or two weeks from Monday, the first of next year or whatever, they can do that by *written contract* at any time they so desire to do so.

122 Cong.Rec. 12878 (May 6, 1976) (emphasis added).

The regulations issued by the Secretary of Agriculture under the authority of § 409(b) are consistent with this interpretation of the Act. Under 9 C.F.R. § 201.200 (1981),[6] packers whose average annual purchases exceed $500,000 may not purchase livestock on credit unless the packer obtains from the seller a written acknowledgment that the seller agrees to make the sale on credit and that the seller waives his rights under the trust provisions of the Act, 7 U.S.C.A. § 196 (West 1980). The regulations also require the packer to retain the

> Provides that it will remain in effect until (date).
> Provides that it will remain in effect until canceled in writing by either party.
> (Omit the provisions not applicable.)
> Date ————————————————
> Signature ——————————————
>
> (2) Such packer retains such acknowledgment, together with all other documents, if any, setting forth the terms of such credit sales on which the purchaser and seller have agreed, and such dealer or market agency retains a copy thereof, in his records for such time as is required by any law, or by written notice served on such person by the Administrator, but not less than two calendar years from the date of expiration of the written agreement referred to in such acknowledgment; and
>
> (3) Such seller receives a copy of such acknowledgment.
>
> (b) Purchasing livestock for which payment is to be made by a draft which is not a check, shall constitute purchasing such livestock on credit within the meaning of paragraph (a) of this section. (See also § 201.-43(b)(1)),
>
> (c) The provisions of this section shall not be construed to permit any transaction prohibited by § 201.61(a) relating to financing by market agencies selling on a commission basis, or by § 201.68 relating to financing packers by dealers or vice versa.

acknowledgment and to give a copy of the acknowledgment to the seller.[7]

For the foregoing reasons, we hold that a livestock purchase is not exempt from the trust provisions of § 206, unless the packer obtains from the seller a writing which clearly indicates that the seller has extended credit to the packer and thereby waived protection of the trust provisions of the Act. In the instant case, there is no evidence that Gotham obtained any such writing from any of the appellee livestock sellers. The record reflects that on October 22, 1977, Gotham did send to parties from whom it had purchased cattle a form for their signatures which basically tracked the language of the suggested form in § 201.-200 for a written acknowledgment of an express extension of credit. However, none of the appellees signed such a form or any writing to indicate that credit had been expressly extended. Based on the record in this case, we hold that the appellees were cash sellers within the meaning of the Act.

The Bank raises two additional arguments on this question which merit some attention. First, the Bank argues that the credit or cash nature of a sale need not be determined by a writing, but may be ascertained by examining the course of dealings between the parties. Specifically, the Bank urges that the court should find a credit sale under the Act whenever the parties to the livestock transaction have an expectation that payment would occur after the end of the two-day period established by § 409.[8] Although in the abstract such a rule might have some appeal, it is not the rule that Congress selected. To adopt the Bank's view would do violence to the wording of the statute, the intent of Congress, and the regulations which reasonably implement the statute. This we decline to do.

The Bank also points to "writings" which it argues support the conclusion that certain of the appellees were not cash sellers. The writing pointed to in the case of appellee U. S. Sugar is an invoice which U. S. Sugar sent to Gotham following the sale of cattle in question. However, the face of that invoice indicates that the terms of the sale were "cash." Defendant's Composite Exhibit 11. With respect to appellee Lykes, the Bank argues that an invoice reflects an agreement to terms of payment as "weekly 2–2." Plaintiff's Composite Exhibit 29. Lykes argues in brief that this is not an invoice but merely a delivery receipt. The document in question is unsigned, and no party has pointed to any evidence explaining the meaning of "weekly 2–2."

No matter how one chooses to characterize these documents, it is clear to this court that they do not constitute an express extension of credit. Not only do these documents fail to contain the language required by 9 C.F.R. § 203.200 or the substantial equivalent thereof, they do not indicate the express intention of the parties to enter

---

7. In brief, the Bank raises some question about the effect of this regulation. Specifically, the Bank argues that since the definition of "cash sale" in § 206(c) does not explicitly state that a writing is required to establish a credit sale, the regulations may not impose such a writing requirement. As outlined above, we interpret § 206(c), in conjunction with § 409 of the Act and the legislative history, to require a writing in order to establish a credit sale under the Act. Therefore, we believe that the regulations clearly "carry into effect the will of Congress as expressed by the statute." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976); *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936). Since there is no question that the Secretary was empowered by § 228b(b) to issue this regulation, since the regulation certainly is a substantive rule affecting individual obligations,

see *Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1971), and since there is no argument that the procedural requirements of the Administrative Procedure Act were not complied with, we hold that the Bank's argument that the regulations do not have the force and effect of law is devoid of merit. *See United States v. Harvey*, 659 F.2d 62 (5th Cir. 1981) (setting forth the test for determining the "force and effect" of a regulation).

8. Of course, the mere failure of a packer to comply with the prompt payment provisions of § 409 of the Act cannot serve as the basis for holding that the transaction is a credit sale, since such an interpretation would destroy the trust provisions of the Act. *See Hedrick v. S. Bonaccurso & Sons, Inc.*, 466 F.Supp. at 1032.

1008

into a credit arrangement, nor do they indicate that the sellers intended to waive protection of the trust provisions of the statute. These documents do not, therefore, transform the appellees from cash sellers to credit sellers.

## II. APPLICATION OF THE TRUST PROVISIONS TO THE BANK

The second major argument advanced by the Bank is that even if the appellees are cash sellers, the trust provisions of the Packers and Stockyards Act should not be construed to give the cash sellers a superior interest in Gotham's accounts receivable as against the Bank. The Bank urges that common law trust principles should govern the enforcement of the § 206 trust; therefore, the appellees must at minimum trace their sales into the accounts receivable over which the Bank held a security interest in order to recover. We are unable to reconcile the Bank's arguments with the language of the statute and its legislative history.

It is clear that the purpose of the 1976 amendments to the Packers and Stockyards Act of 1921 was to provide some future protection for livestock sellers against the type of serious financial loss that cattlemen experienced when some major meat packers went bankrupt in the early 1970's. Of principal concern to Congress was the bankruptcy of American Beef Packers in 1975, at the time one of the largest meat packers in the country. That bankruptcy affected many farmers throughout the country who had delivered their entire year's output of cattle to American Beef Packers and did not receive payment. The provisions of the Uniform Commercial Code placed further impediments in the way of the cattlemen in their battle to obtain compensation, since lenders enjoyed priority over the cattlemen by virtue of secured interests in assets of the packer. The Senate Agriculture and Forestry Committee was explicit in identifying as a target of the legislation the favored position that lenders enjoyed over cattlemen in these situations:

Of particular concern to the livestock producers ... [in the case of American Beef Packers ("ABP")] was the fact that ABP's principal source of financing, General Electric Acceptance Corporation, stood ahead of them among the bankrupt's creditors by virtue of its duly protected security interest in ABP's inventory, i.e., livestock and derivative products which the producers had sold on a cash basis and for which they had not been paid.

Under present law, a packer is able to offer as security for a loan the livestock, meat, meat food products, or receivables or proceeds therefrom, which he has not paid for. The producer, who was responsible for raising, feeding, and caring for the livestock is left unpaid, while secured creditors reap the reward of his labors. . . .

What is needed to prevent future producer tragedies, as occurred following the ABP bankruptcy, is legislation that will afford a measure of protection to the livestock producer and feeder and yet not be so restrictive as to reduce competition in the livestock slaughtering business. H.R. 8410 accomplishes this dual objective.

S.Rep. No. 932, 94th Cong., 2d Sess. 5–6, *reprinted in* [1976] U.S.Code Cong. & Ad. News 2271, 2272.

As finally adopted by Congress, the 1976 amendments, Pub.L. No. 94–410, 90 Stat. 1251, create a comprehensive framework for the protection of the interests of livestock producers in their dealings with packers. The amendments empower the Secretary to require large packers to be bonded, empower the Secretary, after notice and hearing, to order an insolvent packer to cease purchasing livestock, allow the Secretary to seek temporary injunctions and restraining orders against packers, create a private right of action against packers for violation of the Act, require packers to make prompt payment for cash purchases, create a statutory trust for the benefit of unpaid cash sellers, and preempt certain provisions of state law.

Although each of these protections help, to some degree, to ensure that the market for livestock will operate more equitably, it is the trust provision which was most squarely directed at the problem discussed in the Senate Report quoted above—that of secured creditors taking priority over cash sellers of livestock in the event of a packer bankruptcy. To make this clear, Congress included in the trust provision of the Act, § 206, the following statement of findings and intent:

> It is hereby found that a burden on and obstruction to commerce in livestock is caused by financing arrangements under which packers encumber, give lenders security interest in, or place liens on, livestock purchased by packers in cash sales, or on inventories of or receivables or proceeds from meat, meat food products, or livestock products therefrom, when payment is not made for the livestock and that such arrangements are contrary to the public interest. This section is intended to remedy such burden on and obstruction to commerce in livestock and protect the public interest.

7 U.S.C.A. § 196(a) (West 1980).

▮ If any doubt is left regarding whether Congress intended § 206, the trust provision of the amendments to the Act, to give priority to the interests of cash sellers of livestock in packer inventories, accounts receivable, and proceeds derived from the cash seller's livestock over lenders who take security interests in these assets, we think that the following statement of the principal sponsor of the 1976 amendments to the Act, Rep. Thone, during the House debates lays any such doubt to rest:

> Why do we need this trust provision? Frankly, as I see it, this is central to the bill. Without the trust provision we have not really helped [farmers such as those injured by the American Beef Packers bankruptcy].
>
> What is the need for it, then? What are the arguments for the trust? First we have the simple answer of equitable treatment. How can one argue that a packer should be able to commit property as collateral for a loan, in this particular case livestock, for which he has not paid and does not actually own, to a third party, and then allow the third party to stand ahead of the producers if the packer fails?
>
> Again some would argue that by having the bond and the prompt pay and the solvency test, why do we need this trust provision? The answer is that *the trust provision will help prevent a packer from giving a priority to subsequent secured creditors, over the livestock producer who has not been paid.* The trust is the only provision here that gives any help to the farmer.

122 Cong.Rec. 12864 (May 6, 1976) (emphasis added).[9] In view of the foregoing, we believe that if a lender could defeat the § 206 trust merely by taking a security interest in inventories and receivables, the clear intention of Congress would be thwarted and the trust provision of the Act would be reduced to a nullity.[10] We hold

---

**9.** We think that this excerpt from the legislative history sufficiently answers the Bank's argument that the cash sellers should be estopped from invoking the trust because of their failure to avail themselves of other remedies provided for in the 1976 amendments. There is absolutely no support in the statute for such an argument. Furthermore, the remarks of Rep. Thone quoted above make it clear that the trust section is not dependent on other remedial provisions in the Act, but is the only provision in the amended Act which will ensure that unpaid cash livestock sellers receive full protection. Likewise, we find the Bank's other estoppel arguments—that the appellees "clothed Gotham with apparent ownership of the trust property," Brief of Appellant at 43, causing the Bank to rely on such a representation to its detriment, and that, as between the two "innocent" parties in this case, the appellees, rather than the Bank, must bear the loss since the appellees' acts occasioned the loss here—to be without basis in law or fact.

**10.** For this reason, we reject the Bank's argument that holders of secured interests in receivables stand in the same shoes as grocery stores who purchase the meat obtained by slaughtering the cash seller's livestock. The discussion above demonstrates the intent of Congress that the trust reach the former case; that the latter case is outside the purview of the trust is demonstrated by the following excerpts from the House debates:

that so long as cash sellers remain unpaid for their livestock sold to a packer subject to § 206, that packer must hold his inventories, accounts receivable and proceeds derived from cash sales for the benefit of the cash sellers until such time as they are fully paid. Where the packer has given a lender a security interest in inventories or receivables that are subject to the § 206 trust, the unpaid cash sellers have priority over those assets and may recover the proceeds of those receivables to the extent of the outstanding balance on the cash sales. In this case, the appellees are entitled to the collections of the receivables held in escrow, and the Bank must return to the appellees from the payments on the accounts receivable which were applied to reduce the balance of the Bank's loan to Gotham the amount necessary to compensate the appellees in full for their cash sales to Gotham.

The Bank argues that the appellees must trace the particular accounts receivable derived from the sale of their livestock into the Bank's hands in order to recover. The Secretary of Agriculture, as *amicus curiae*, advances a different interpretation of the statute. The Secretary argues that no specific identification of the accounts receivable that cover the products of an individual cash seller was intended by Congress. The bankruptcy court below agreed with the Secretary, holding that the trust consisted of a floating pool of those assets derived from appellees' livestock as well as inventories, receivables and proceeds derived from other cash sellers' livestock. *In re Gotham Provision Co., Inc.*, 1 B.R. 255, 260–61 (Bkrtcy.S.D.Fla.1979)

Mr. BERGLAND. [D]id the committee intend the trust provisions under section 8 would extend to the meats or meat food products purchased and held by the retailers in a good faith transaction?
Mr. THONE. No. In those cases the trust would attach to the accounts receivable or proceeds received by the packer in exchange for such products.
122 Cong.Rec. 12867 (May 6, 1976). *See* Business Meetings on Packers and Stockyards Act of 1921, House Committee on Agriculture, 94th Cong. 2d Sess. (December 1976), pt. 62 (statement of Mr. Robert Bor, counsel to the committee, to the same effect).

We conclude that the bankruptcy court was correct in rejecting the Bank's argument that specific tracing is required to establish that accounts receivable are subject to a § 206 trust. The language of the Act itself, § 206(b), does not clearly answer this question. However, a review of the legislative history convinces us that Congress did not intend that livestock producers perform the almost impossible task of tracing their products into specific receivables.

The report of the Senate Committee on Agriculture and Forestry directly refutes the Bank's specific tracing argument. Discussing the § 206 trust, the Committee stated:

> Under this provision, *no specific identification of the livestock or the carcasses, meats, proceeds or receivables derived therefrom is required.* Instead, they are held in a pool in trust for the benefit of all unpaid cash sellers. Each cash seller would be entitled to a pro rata share in settlement of his account.

S.Rep. No. 932, *supra* at 13, [1976] U.S.Code Cong. & Ad.News at 2279. (emphasis added). Further support for the notion that specific tracing is unnecessary and that the trust consists of a floating pool of inventories and receivables is found elsewhere in the legislative history. *See, e.g.*, Business Meetings of the House Committee on Agriculture, *supra*, at 63.[11]

We concede that the legislative history is not totally unambiguous on the issue of

11. Our reference here is to the following exchange:
> Mr. DE LA GARZA. I would like to ask counsel if this trust is identifiable meat or volume of meat equal to that purchased.
> Mr. BOR. It was not the intent of the provision to require that that packer maintain custodial accounts separate for each livestock owner. It was not the intent that he try to identify separately the livestock which was purchased from each separate cattleman or livestock seller.
> Rather, it was the intent that he would hold in a pool, so to speak, his accounts receivable and his meat products in trust for the benefit of all unpaid sellers.

which inventories and receivables are subject to the § 206 trust. However, due to the nature of the meat packing business where, once slaughtered, animal carcasses are quickly cut into meat products and commingled, it is a practical impossibility to identify which receivables correspond to which seller's livestock, whether that seller be an unpaid cash seller, a paid cash seller, or a credit seller. This problem was recognized in the House debates. Referring to the language of § 206(b),[12] Reps. Latta and Thone engaged in the following colloquy:

> Mr. LATTA. . . .

> I would like to ask the gentleman whether or not he is referring in "All livestock purchased" to include livestock that may be paid for by the packer. Say he has livestock and say 50 percent of it has been paid for. Is the gentleman talking about "all" in the context of the livestock that has not been paid for? Mr. THONE. We are talking about "all" in the context of what has not been paid for. But as a practical matter what will occur is that a "floating trust" will exist to insure that unpaid livestock cash sellers are ultimately paid. It need not and should not prevent a packer from obtaining a loan on his livestock, meat products and accounts receivable for normally the amount of unpaid cash sellers outstanding at any one time should not be very great.

122 Cong.Rec. 12867 (May 6, 1976). The "floating trust" to which Rep. Thone refers here is not limited to assets which unpaid cash sellers can prove were derived from their products. To so construe the statute would effectively destroy the trust provision.

In the case at bar, the bankruptcy court found, based on testimony of a principal of Gotham and an officer of the Bank, that the meat products of cash and credit sellers had been commingled, and that the accounts receivable derived from producer cash sales could not be distinguished from those derived from credit sales. The Bank presented no evidence to establish which accounts may be free of the trust.

According to general principles of trust law, noted by the bankruptcy court below, where trust funds are commingled with funds not subject to the trust, a lien on the entire commingled fund exists for the benefit of the beneficiaries of the trust, and those who receive a transfer of assets from the commingled fund with actual or constructive notice of the trust are subject to the lien. Scott, *The Law of Trusts*, §§ 219.4, 519.1 (3d ed. 1967). In this case, the Bank had constructive notice of the trust because a federal statute created the trust.

We hold that where there is a commingling of livestock products such that it is impossible to determine whether a packer's inventories and accounts receivable have been derived from livestock purchased by the packer in a cash sale or credit sale, all of the packer's inventories, accounts receivable and proceeds attributable to livestock sales are subject to the § 206 trust to the extent of the amount owed to the unpaid cash seller.[13] The only burden on the unpaid cash sellers in such a case is to prove the balance due to them and the existence of a floating pool of commingled inventories of livestock products, accounts receivables and proceeds derived from cash and credit livestock sales.[14] Since the appellees

---

**12.** See note 1, *supra*, for the text of § 206(b).

**13.** We note that the bankruptcy court in *In re Frosty Morn Meats, Inc.*, No. BK–77–31707 (M.D.Tenn. Aug. 31, 1978), held the § 206 trust extended to all inventories, receivables and proceeds derived from cash sales of livestock, but would not extend to assets which could be identified as being derived from credit sales. Since the Bank introduced no evidence to identify any of the accounts receivable as being

derived from credit sales, we need not decide the issue reached by the *Frosty Morn* court.

**14.** That this is the result intended by Congress is further revealed in the following excerpt from the Congressional Record which contains the responses by the Administrator of the Packers and Stockyards Administration of the Department of Agriculture to written questions submitted by Rep. Thone:

> 1. Section 8 of the bill impresses a trust on all "livestock purchased by a packer in

have carried this burden in this case, they are entitled to recover against the Bank the amount awarded by the bankruptcy court.

### III.  PRESERVATION OF THE § 206 TRUST

The Bank argues next that two appellees, Rogers and Perkins, did not preserve their rights to the trust by making the proper timely filing of notice with the Secretary of Agriculture.    Both Rogers and Perkins made cash sales to Gotham on a "grade and yield" basis.  The prices for 15 of Rogers' cattle and 16 of Perkins' cattle were determined on Wednesday, February 14, 1979, and the prices for the remaining Perkins' cow and the 79 other Rogers' cattle were determined on the following day, February 15, 1979.  Plaintiff's Composite Exhibit No.

21.   Under 7 U.S.C.A. § 228b (West 1980), the final dates by which Gotham was required to make payments on these cattle were February 15 and 16, 1979, and the 30-day periods following these dates ended on March 17 and 18, 1979.  It is not disputed that both Rogers and Perkins gave timely notice to Gotham.  The notice that Rogers filed with the Secretary bears a stamp "Received March 19, 1979," and Perkins' notice bore a "Received March 23, 1979" stamp.  Plaintiff's Composite Exhibit No. 22.  The bankruptcy court held that each cash seller "filed sufficient notice with the Debtor and with the Secretary within the time periods prescribed by § 206."  *In re Gotham Provision Co., Inc.*, 1 B.R. at 259. The district court affirmed, holding that because Gotham received written notice and the Secretary received actual notice within

cash sales and all inventories of or receivables or proceeds from meat, meat food products, or livestock derived therefrom" for the benefit of all unpaid cash sellers until full payment has been made.  It was not intended by the Committee that any on-going segregation of funds (custodial account) would be required by this provision.  Do you see any necessity for segregation of such current assets?

Answer:  No.  There would be no need for any special segregation of such current assets, since under the bill the trust attaches on such livestock, inventories, receivables and proceeds to the extent of the amount owed the unpaid cash sellers and there would be no necessity for a determination of the amount of that trust except in situations, such as bankruptcy, where the interests of various claimants must be specifically determined. The amount of the trust could be determined from the packer's records at any time by an audit.  *Although the livestock, inventories, receivables and proceeds derived from the livestock purchased by the packer in cash sales would be commingled with all other assets in the normal operations of the business, such an audit would reveal the extent of the interest of the unpaid cash sellers in such commingled assets and therefore subject to the trust.*

.          .          .          .          .

3.  The Committee intended that the trust established by section 8 be a constructive statutory trust arising by operation of law and that it need not specifically identify the livestock, accounts receivable, meat or meat products to which it attaches until the event (insolvency or bankruptcy) occurs which, as a result of its occurrence (marshalling of as-

sets, etc.), results in the identification of certain assets to which it has attached.

As a practical matter, based on the experience of the Packers and Stockyards Administration, should such identification of assets to which the trust would attach, in the event of bankruptcy, cause any difficulty in the administration of this program as outlined above?

Answer:  No.  There should be no problem encountered in identifying the livestock, accounts receivable, and proceeds from the meat, meat food products, or livestock products subject to the trust for the unpaid cash sellers of the livestock.  Under section 401 of the Packers and Stockyards Act, every packer is required to keep such accounts, records and memoranda as fully and correctly disclosed all transactions involved in his business.  Insofar as we are aware, every packer keeps books and records from which the amount of the inventories, receivables and proceeds and the amount owed to each unpaid cash seller of the livestock to the packer can be determined by an audit of those books and records.  *Upon bankruptcy, for example, an audit would reveal the amount of the commingled inventories, accounts receivable and proceeds, the amount owed to the unpaid cash sellers of livestock to the packer and thus the extent of the application of the trust. The audit would reveal the amount which must be paid to the unpaid cash sellers before the commingled inventories, accounts receivable, and proceeds are freed from the trust.*  Accordingly, we foresee no problem in the administration of this program as contemplated by the Committee.

122 Cong.Rec. 18825 (June 17, 1976) (emphasis added).

the required 30-day period, the trust was preserved.

Section 206(b) establishes a notice requirement for unpaid cash sellers who wish to invoke the § 206 trust. Section 206(b) provides, in pertinent part:

> *Provided,* That the unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received, within thirty days of the final date for making a payment under section 228b of this title, or within fifteen business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection. The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary.

In cases such as the one at bar where the unpaid cash sellers have not received any payment instrument, the statute requires that unpaid cash sellers give written notice to the debtor packer and file that notice with the Secretary. Both the notice to the packer and the filing with the Secretary must be performed within the 30-day period following the final date for making payment under § 409, 7 U.S.C.A. § 228b (West 1980) in order to preserve the trust.[15]

▪ Appellees Rogers and Perkins and the Secretary of Agriculture as *amicus curiae* argue that the statutory requirement for filing is satisfied if the Secretary has actual notice of the intent of the cash sellers to invoke the § 206 trust within the requisite 30-day period. Here there is evidence that the Secretary had such notice, since officials of the Department of Agriculture personally notified the cash sellers of Gotham's bankruptcy petition.

We reject the argument that actual notice to the Secretary of the type found in this case is sufficient to preserve the trust under § 206. This argument is facially inconsistent with the language of the statute, which requires an unpaid cash seller to *file* notice with the Secretary rather than to give notice. Furthermore, the legislative history is explicit in rejecting the proposition that notice given by the Secretary to livestock producers of the bankruptcy of a packer satisfies the filing requirement of the statute. The Senate Report states:

> The Committee further believes that it would be most beneficial if the Secretary, through the Packers and Stockyards Administration, would formulate some means of notifying producers of a packer bankruptcy. *This notification would not affect the time periods established in section 8 [of the Bill, § 206 of the Act] for an unpaid seller to notify the packer and the Secretary in order to preserve his right to the trust.* Such notification should spur unpaid cash sellers to file their notices, and thereby preserve their right to the trust, while also allowing more rapid determination of the scope of the bankrupt packer's estate.

S.Rep. 932, *supra,* at 13, [1976] U.S.Code Cong. & Ad.News at 2279 (emphasis added).[16]

As noted above, the notice which appellee Rogers Farms, Inc. filed with the Secretary was marked "Received March 19, 1979," thirty-one and thirty-two days after the final dates for making payment for its cattle sold in the two groups of sales, respectively. The statutory deadlines for filing notice with the Secretary, however, occurred on Saturday, March 17, 1979 and Sunday, March 18, 1979. Therefore, we now turn to the question of whether a filing

---

**15.** *See* 9 C.F.R. § 203.15 (1981) for the regulations which correspond to the notice provision of the statute.

**16.** The Secretary cites two Miller Act cases, *United States v. H. I. Lewis Construction Co.,* 375 F.2d 194, 199–201 (2d Cir. 1967) and *United States for the Use of Greenwald-Supon v. Gramercy Contractors, Inc.,* 433 F.Supp. 156 (S.D.N.Y.1977), for the proposition that remedi-

al statutes should be liberally construed, in order to effectuate congressional intent, to allow timely actual notice to satisfy statutory notice requirements. While we agree that this statute is remedial in nature, we would be forced to ignore clearly stated congressional intent in order to accept the actual notice standard advanced by the Secretary. This we decline to do.

**1014**

on Monday, March 19, 1979, would be timely because the filing periods ended on a weekend.

█ Rule 6(a) of the Federal Rules of Civil Procedure sets forth the basic rules for computing time periods in connection with proceedings in federal court. Rule 6(a) provides, in pertinent part:

> In computing any period of time prescribed or allowed by these rules, by the local rules of any district court, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday.

There is some dispute as to whether Rule 6(a) applies directly to federal statutes of limitations or whether it may be invoked only by analogy. Compare 2 Moore's Federal Practice ¶ 6.06[2] (2d ed. 1981) (taking the position that Rule 6(a) cannot expressly apply to a statute of limitation) with Wright & Miller, *Federal Practice and Procedure*, § 1163 (1969) (noting that the majority rule is that Rule 6 is applicable to statutes of limitations). We need not explore the subtleties of this debate, because, as we stated in *Lawson v. Conyers Chrysler, Plymouth and Dodge Trucks, Inc.*, 600 F.2d 465, 466 (5th Cir. 1979), "[t]his court has consistently used Rule 6(a)'s method for computing federal statutory time limitations." Although the *Lawson* case involved the issue of whether the day on which an act was performed should be counted in connection with the time limitations in the Truth In Lending Act, each of the cases cited by the *Lawson* court to support the above quoted statement, *J. Aron & Co. v. S/S Olga Jacob*, 527 F.2d 416, 417 (5th Cir. 1976), *Wilkes v. United States*, 192 F.2d 128, 129 (5th Cir. 1951) and *Rimmer v. United States*, 172 F.2d 954, 958–59 (5th Cir. 1949), applied the method of Rule 6(a) for computing statutory time periods when the last day of the period occurs on a Saturday, Sunday or holiday and held that actions performed on the next business day were timely under the statutes involved.[17]

We see no reason why the method of Rule 6(a) should not be invoked for purposes of computing the 30-day notice and filing period prescribed by § 206 of the Packers and Stockyards Act. The justifications offered by the Supreme Court in *Union National Bank v. Lamb*, 337 U.S. 38, 41, 69 S.Ct. 911, 912, 93 L.Ed. 1190 (1949), for applying the method of Rule 6(a) in connection with 28 U.S.C. § 2101(c) (1948) have equal force here: "[s]ince the rule had the concurrence of Congress, and since no contrary policy is expressed in the statute governing this review, we think that the considerations of liberality and leniency which find expression in Rule 6(a) are equally applicable ... [to the statutory time period involved here]." Moreover, the Packers and Stockyards Act is a remedial statute. Therefore, as we noted in connection with the Truth In Lending Act, the application of "Rule 6(a) is particularly appropriate in light of the remedial purposes of the Act." *Lawson v. Conyers Chrysler, Plymouth and Dodge Trucks, Inc.*, 600 F.2d at 466.

Applying the method of Rule 6(a) to the facts of this case, we hold that the statutory period for preserving the § 206 trust for appellees Rogers and Perkins ended on Monday, March 19, 1979. Since there is no

---

17. Although other courts have applied the method of Rule 6(a) to time limits imposed by remedial statutes such as Title VII, *see, e.g., Pearson v. Furnco Construction Co.*, 563 F.2d 815, 818–19 (7th Cir. 1977); *Kane v. Douglas, Elliman, Hollyday & Ives*, 635 F.2d 141 (2d Cir. 1980), the district court in *Smith v. Bailor*, 22 FEP Cases 1378 (N.D.Ga.1980), declined to apply Rule 6(a) to the 30-day period for filing suit against the federal government under 42 U.S.C. § 2000e–16. We recognize that the *Smith* case is inconsistent with the rule set forth above. However, the underlying rationale of *Smith*, that the Title VII time period involved was jurisdictional (and, therefore, in the view of the *Smith* court, not subject to extension under Rule 6(a)) is questionable in view of the *en banc* opinion of this court in *Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584 (5th Cir. 1981).

dispute that Rogers gave written notice to Gotham and filed with the Secretary no later than March 19, Rogers preserved its right to the § 206 trust.

The USDA stamped Perkins' notice as "received" on March 23, 1979. Both Perkins and the Secretary contend that filing does not occur when the USDA stamps the notice "received," but is effective when notice is transmitted to the Secretary. The bankruptcy court did not address this issue and made no findings of fact as to when Perkins' notice to the Secretary was mailed or received.

■ Although the stamp applied by the Secretary to the notice papers is conclusive evidence that filing occurred no later than the date of the stamp, it is not conclusive evidence that the notice was not received in the Secretary's office at an earlier date.[18] In a case where there was some delay in affixing the stamp "received" on the notice, the date of receipt would certainly be a more appropriate measure of filing.[19] We are convinced, therefore, that filing is effective no later than the time written notice is actually received in the USDA offices. However, in view of the absence of findings of fact relating to the date that Perkins' notice was transmitted and the date it was received in the USDA office, and in view of the inadequate development in this litigation of the issue of what constitutes filing, we decline to decide whether the filing required by § 206(b) occurs when notice is transmitted to the Secretary. We therefore remand Perkins' case for further proceedings.

■ The Bank raises one further claim, that Rogers Farms, Inc. was not a proper party to file a claim under § 206, since Gotham had purchased its cattle from Billie Rogers Farm, an unincorporated separate entity. The bankruptcy court found that Billie Rogers Farm had assigned all of its accounts receivable to Rogers Farms, Inc., and held that the assignee could perfect a claim under § 206. The court further noted that there was no showing that this assignment was prejudicial to Gotham or to the Bank. We agree with the bankruptcy court that Rogers Farms, Inc. is entitled to the protection of § 206 with respect to the cattle for which it remains unpaid.

## IV.  CONCLUSION

The bankruptcy court's decision, affirmed by the district court, properly held that the appellees were cash sellers within the meaning of § 206 of the Packers and Stockyards Act, and that those cash sellers who had properly preserved the § 206 trust were entitled to recover the unpaid balance on their sales of livestock from the trust assets, both those held in escrow and those in the hands of the Bank. The bankruptcy court did not make sufficient findings to determine whether appellee Perkins preserved his rights to the § 206 trust, and therefore the judgments below with respect to Perkins are reversed and the case is remanded. All other appellees have properly preserved the § 206 trust, and the judgments as to those parties are affirmed.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

**18.** There is no doubt that whatever acts are required to make a filing under § 206, Rogers filed notice no later than March 19, 1976, and Perkins filed no later than March 23, 1976. Since there are no findings of fact on the issues of when notice to the Secretary was sent or received in Perkins' case, it is not established that one or both of these events did not occur by March 19. We believe that it is inappropriate to reach the issue of whether transmittal of written notice to the Secretary by mail or otherwise would constitute filing until these factual issues are answered.

**19.** The court in *Hedrick v. S. Bonaccurso & Sons, Inc.*, 466 F.Supp. at 1032, did not address this issue, but assumed that filing occurred on the date stamped.