**LIBERTY MUTUAL INSURANCE COMPANY, as subrogee of Arbogast & Bastian, Inc., Liberty Mutual Insurance Company, Plaintiffs–Appellees–Cross–Appellants,**

v.

**ROTCHES PORK PACKERS, INC., Defendant,**

**Bankers Trust Company, Defendant–Appellant–Cross–Appellee.**

Nos. 690, 843, Dockets 91–7831, 91–7889.

United States Court of Appeals, Second Circuit.

Argued Jan. 7, 1992.

Decided July 8, 1992.

Robert Fracasso, New York City (Naomi B. Waltman, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for defendant-appellant-cross-appellee.

Richard Weinberger, New York City (Harvey L. Woll, Ballon, Stoll & Itzler, New York City, of counsel), for plaintiffs-appellees-cross-appellants.

Before: MINER, ALTIMARI, and MAHONEY, Circuit Judges.

J. DANIEL MAHONEY, Circuit Judge:

Defendant-appellant-cross-appellee Bankers Trust Company ("Bankers Trust") appeals from a judgment in the amount of $1,363,147.21 entered August 8, 1991 in the United States District Court for the Southern District of New York, Robert P. Patterson, Jr., *Judge*, to enforce a statutory trust under section 206 of the Packers and Stockyards Act of 1921, as amended (the "Act"), 7 U.S.C. § 196 (1988).[1] Plaintiffs-appellees-

---

1. Section 196 provides:

(a) It is hereby found that a burden on and obstruction to commerce in livestock is caused by financing arrangements under which packers encumber, give lenders security interest in, or place liens on, livestock purchased by packers in cash sales, or on inventories of or receivables or proceeds from meat, meat food products, or livestock products therefrom, when payment is not made for the livestock and that such arrangements are contrary to the public interest. This section is intended to remedy such burden on and obstruction to commerce in livestock and protect the public interest.

(b) All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers: *Provided,* That any packer whose average annual purchases do not exceed $500,000 will be exempt from the provisions of this section. Payment shall not be considered to have been made if the seller receives a payment instrument which is dishonored: *Provided,* That the unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received, within thirty days of the final date for making a payment under section 228b of this title, or within fifteen business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection. The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary.

cross-appellants Liberty Mutual Insurance Company, as subrogee of Arbogast & Bastian, Inc. ("Arbogast"), and Liberty Mutual Insurance Company (collectively "Liberty Mutual") cross-appeal, seeking an award of attorney fees.

Reversed on the appeal, affirmed on the cross-appeal, and remanded for further proceedings.

## Background

### A. *The Facts.*

Arbogast was a Pennsylvania corporation that purchased and slaughtered livestock and sold livestock, livestock products, meat, and meat products. Liberty Mutual, a Massachusetts corporation engaged in the insurance business, issued a surety bond in the amount of $620,000.00 to Arbogast on May 20, 1983 to guarantee payment to farmers for livestock purchased by Arbogast, pursuant to 7 U.S.C. § 204 (1988) and regulations promulgated thereunder.

Defendant Rotches Pork Packers, Inc. ("Rotches") was a New York corporation engaged in cutting and selling meat food products. Rotches was a customer of Arbogast, purchasing livestock products upon credit or open account pursuant to a security agreement or agreements that provided Arbogast with a security interest in Rotches' accounts receivable and other personal property.

Bankers Trust, a New York bank, entered into accounts financing and security agreements with Rotches on March 25, 1983. These agreements called upon Bankers Trust to extend a line of credit to Rotches in exchange for a security interest in Rotches' accounts receivable and other assets. In view of the conflicting interest provided to Arbogast by the Security Agreement, Arbogast entered into an agreement with Bankers Trust on April 28, 1983 (the "Subordination Agreement") that subordinated Arbogast's security interest in Rotches' accounts receivables and other personal property to the security interest

of Bankers Trust therein. Simultaneously, David A. Rotches, the owner of Rotches, provided Arbogast with a personal guarantee of Rotches' indebtedness to Arbogast and a mortgage on his home.

In April 1984, David Rotches, with Arbogast's agreement, began to oversee Arbogast's Allentown, Pennsylvania plant in an effort to increase the daily hog kill volume to plant capacity. In early May 1984, David Rotches closed Rotches and stopped payment on certain checks payable to Arbogast dated April 27, 1984 to May 5, 1984 totaling $818,822.57, alleging a fraudulent course of dealing by Arbogast. On or about May 11, 1984, Arbogast filed for bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Pennsylvania. Subsequently, Arbogast filed an adversary proceeding in the bankruptcy court against Rotches and Bankers Trust to recover funds allegedly owed to Arbogast. This action was dismissed without prejudice by stipulation on March 19, 1985.

In the course of the bankruptcy proceeding, fifty-seven sellers of livestock to Arbogast (the "Sellers") filed claims for nonpayment totaling $1,445,037.68. On September 10, 1984, the bankruptcy court authorized Arbogast to distribute $545,960.00 pro rata to the Sellers out of Arbogast's assets. On April 3, 1985, the bankruptcy court authorized Liberty Mutual to pay the total amount of the surety bond, $620,000.00, to the Sellers pro rata.

In exchange for these payments, at least forty-seven Sellers assigned to Liberty Mutual all their rights and causes of action arising out of transactions with Arbogast, including those arising under the Act. Liberty Mutual also claims that it was subrogated to certain rights of Arbogast and the Sellers as a result of Liberty Mutual's performance of the surety bond.

### B. *The Proceedings Below.*

On May 16, 1988, Liberty Mutual filed a complaint in this action asserting rights

---

(c) For the purpose of this section, a cash sale means a sale in which the seller does not expressly extend credit to the buyer.

derived by assignment and subrogation, as described above. The complaint included one claim against Bankers Trust and one against Rotches calling for each of them to pay to Liberty Mutual funds allegedly held subject to a statutory trust created under § 196(b). Liberty Mutual sought interest, costs, and attorney fees on both claims. Bankers Trust answered with a general denial. Rotches is apparently defunct, and has not appeared or answered.

After discovery, Liberty Mutual and Bankers Trust each moved for summary judgment. Liberty Mutual contended that funds and accounts receivable of Rotches that were in the possession of Bankers Trust constituted assets of (1) a § 196(b) statutory trust of which Arbogast was the trustee, or alternatively of (2) a § 196(b) statutory trust of which Rotches was the trustee and Arbogast a beneficiary, and in either event Liberty Mutual had succeeded to Arbogast's rights. Bankers Trust primarily claimed that: (1) no statutory trust had been proven; (2) any trust of which Arbogast was trustee could not reach the assets of Rotches held by Bankers Trust because of the Subordination Agreement; and (3) the statutory requirements were not satisfied as to any alleged statutory trust of which Rotches was the trustee and Arbogast the beneficiary.

In a revised opinion and order entered February 13, 1991, the district court granted Liberty Mutual's motion for summary judgment in part, and denied Bankers Trust's cross-motion for summary judgment. *Liberty Mut. Ins. Co. v. Bankers Trust Co.*, 758 F.Supp. 890, 891 (S.D.N.Y. 1991). The court initially held that orders of the bankruptcy court dated September 10, 1984 and April 3, 1985 (the "Bankruptcy Orders"), and a Decision and Order of the Judicial Officer of the United States Department of Agriculture dated April 13, 1987 (the "Agriculture Order"), established the existence of a statutory trust of which Arbogast was the trustee and the Sellers were the beneficiaries. *Id.* at 893 & n. 3. The court next addressed the question whether "the assets of [Rotches], now held by Bankers Trust" constituted a part of the corpus of that statutory trust. *Id.* at 894.

After examining that issue, the court concluded "that [Arbogast's] accounts receivable from [Rotches] can be recovered by Liberty Mutual in this action to the extent that Liberty Mutual can establish that they are valid claims of the statutory trust for funds required to make payments under the statutory trust to the Sellers and not claims asserted on behalf of [Arbogast] in a non-trustee capacity." *Id.* at 895.

The court also ruled that the Subordination Agreement was ineffective as to Arbogast's (and thus Liberty Mutual's) rights under the statutory trust, because "[Arbogast] as trustee did not have power to enter into the [Subordination] Agreement which purported to subordinate trust assets, i.e. [Arbogast's] prior security interest in the assets of [Rotches]." *Id.* (footnote omitted). Finally, the court determined that no statutory trust could be asserted of which Rotches was the trustee, and Arbogast the beneficiary, because Rotches did not purchase "livestock" from Arbogast within the meaning of § 196(b). *Id.* at 895–96.

In an opinion and order entered April 1, 1991, the district court affirmed its prior ruling after considering further submissions from the parties. *Liberty Mut. Ins. Co. v. Bankers Trust Co.*, 761 F.Supp. 9, 10–11 (S.D.N.Y.1991). The court also determined that Bankers Trust was liable for prejudgment interest "at the rate of 9% per annum from May 18, 1984, the date on which the [bankruptcy court] temporarily enjoined [Rotches] and Bankers Trust from diverting the proceeds of sales of livestock and [Rotches'] accounts receivable. *Id.* at 12.

In an opinion and order entered June 25, 1991, the district court denied Liberty Mutual's application for attorney fees, ruling that the Act did not provide for the award of attorney fees except under limited circumstances not presented by this case, *Liberty Mut. Ins. Co. v. Bankers Trust Co.*, 768 F.Supp. 70, 71–72 (S.D.N.Y.1991), and that no other basis existed for an award of attorney fees. *Id.* at 73–74. Based upon all the foregoing, judgment was entered on August 8, 1991 in favor of Liberty Mutual

in the amount of $1,363,147.21 (principal, $827,067.73; interest as of July 30, 1991, $535,939.24; costs, $140.00) against Bankers Trust and Rotches (by default).

This appeal followed.[2]

## Discussion

The parties essentially reiterate on appeal the contentions advanced to the district court.[3] We address the claims of Bankers Trust regarding (1) the district court's reliance upon the Bankruptcy Orders and the Agriculture Order in determining the establishment of a statutory trust, and (2) the extent, if any, to which assets of Rotches in the possession of Bankers Trust may be deemed part of the corpus of any statutory trust of which Arbogast is the trustee. Preliminarily, we express our agreement with the district court's rulings as to prejudgment interest and attorney fees, for the reasons stated by the district court, while noting that these rulings may not be pertinent to the future course of this litigation.

We review a grant of summary judgment de novo, examining the evidence and the inferences to be drawn therefrom in the light most favorable to the party opposing the motion. *Arledge v. Stratmar Sys., Inc.,* 948 F.2d 845, 847 (2d Cir.1991) (citing *Prunier v. City of Watertown,* 936 F.2d 677, 679 (2d Cir.1991)).

### A. *Evidentiary Rulings.*

The district court predicated its ruling that a statutory trust had been created upon the Bankruptcy Orders and the Agriculture Order. Only "such facts as would be admissible in evidence" are properly considered on a motion for summary judgment. Fed.R.Civ.P. 56(e). The district court deemed the Bankruptcy Orders admissible pursuant to Fed.R.Evid. 201, and the Agriculture Order pursuant to Fed.

R.Evid. 803(8)(C). 758 F.Supp. at 893 n. 3. We conclude that the Bankruptcy Orders and the Agriculture Order were not admissible to establish the existence of a statutory trust.

### 1. *The Bankruptcy Orders.*

In evaluating Bankers Trust's claim that no statutory trust had been created, the district court took "notice of the Bankruptcy Court's factual finding that the Sellers listed in Schedule A attached to its order provided the notices required to preserve their trust rights and were cash sellers," 758 F.Supp. at 893 n. 3, citing Fed.R.Evid. 201(b). Rule 201(b) provides:

A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Apparently, the district court believed that the finding of the bankruptcy court fell into the latter category. We disagree. A court may take judicial notice of a document filed in another court "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (citing *United States ex rel. Geisler v. Walters,* 510 F.2d 887, 890 n. 4 (3d Cir.1975)). Here, however, the district court relied upon the Bankruptcy Orders precisely to establish facts asserted therein, i.e., "that the Sellers listed in Schedule A attached to [the bankruptcy court's] order provided the notices required to preserve their trust rights and were cash sellers." 758 F.Supp. at 893 n. 3. We note further, as the district court recognized, *id.* at 893, that the doctrine of collateral estoppel cannot be invoked in support of the district court's ruling because Bank-

---

2. Bankers Trust sought a stay of judgment pending appeal without being required to post a supersedeas bond. The district court granted the stay, but subject to the condition that a supersedeas bond be provided pursuant to Fed.R.Civ.P. 62(d). *Liberty Mut. Ins. Co. v. Bankers Trust Co.,* 769 F.Supp. 130, 132 (S.D.N.Y.1991).

3. Liberty Mutual does not press on appeal, however, the claim that a § 196(b) statutory trust was established of which Rotches was the trustee and Arbogast the beneficiary. In any event, we agree with the ruling of the district court on this issue.

ers Trust was not a party to the bankruptcy proceeding.

The cases cited by the district court (*id.* at 893 n. 3) in support of its judicial notice ruling are inapposite. In *E.I. du Pont de Nemours & Co. v. Cullen*, 791 F.2d 5 (1st Cir.1986), the court took judicial notice of a complaint that had been filed in a related state court action to ascertain the legal nature of the claim stated in that complaint, not to support any factual determination in the subsequent litigation. *See id.* at 7–8. Similarly, in *Ives Lab., Inc. v. Darby Drug Co.*, 638 F.2d 538, 544 n. 8 (2d Cir.1981), *rev'd on other grounds sub nom. Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), we took judicial notice of several indictments simply to establish that such indictments had in fact been returned, but "of course express[ed] no opinion as to the guilt or innocence of those indicted."

### 2. *The Agriculture Order.*

The district court deemed the Agriculture Order admissible pursuant to Fed. R.Evid. 803(8)(C). 758 F.Supp. at 893 n. 3. Rule 803(8)(C) establishes a hearsay exception for "reports ... of public offices or agencies ... setting forth ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."

Assuming that the rule applies by its terms to the Agriculture Order, however, that order lends no support to the existence of a § 196(b) statutory trust.[4] Rather, the Agriculture Order involved an inquiry whether Rotches had violated another provision of the Act, 7 U.S.C. § 202(a) (1988), and expressly stated: "a statutory trust as required by Section 206(b) of the Act, 7 U.S.C. § 196(b), is not involved here."

Bankers Trust contends on appeal that Liberty Mutual introduced no evidence other than the Bankruptcy Orders and the Agriculture Order in support of the estab-

lishment of a statutory trust, so summary judgment should be awarded to Bankers Trust. There are substantial indications in the record, however, that a § 196(b) statutory trust was in fact established. *See also In re Arbogast & Bastian, Inc. (Gibson v. Arbogast & Bastian, Inc.)*, 42 B.R. 633, 636 (Bankr.E.D.Pa.1984) (ruling that plaintiff in that case was a beneficiary of a § 196(b) statutory trust of which Arbogast was trustee). Liberty Mutual should have an opportunity to proffer admissible evidence on this issue. As stated in 10A Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure* § 2728, at 190 (2d ed. 1983), "when the evidence offered in opposition to [a motion or cross-motion for summary judgment] is defective in form but is sufficient to apprise the court that there is important and relevant information that could be proffered to defeat the motion, summary judgment ought not to be entered."

We accordingly assume for present purposes that a § 196(b) statutory trust was established in which Arbogast was the trustee for the benefit of the Sellers, and next address the question whether that trust extends to the receivables and other property of Rotches in the possession of Bankers Trust.

### B. *The Ambit of the Section 196(b) Statutory Trust.*

Section 196(b) provides in pertinent part:

All livestock purchased by a packer in cash sales, and all inventories of, or *receivables or proceeds* from meat, meat food products, or livestock products derived therefrom, *shall be held by such packer in trust* for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers....

*Id.* (emphasis added).

A private right of action for damages for violations of the Act is provided by 7 U.S.C. § 209(a).[5] An assignee, such

---

4. An initial inquiry from the Department of Agriculture to Rotches suggested a § 196(b) violation, but the subsequent investigation took a different course.

5. Section 209(a) provides:

If any person subject to this chapter violates any of the provisions of this chapter, or of

as Liberty Mutual, is entitled to bring such an action for violation of a § 196(b) trust. *See In re Gotham Provision Co. (First State Bank of Miami v. Gotham Provision Co.)*, 669 F.2d 1000, 1015 (5th Cir. Unit B), *cert. denied*, 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982). In a proper case, such an action may be brought against an entity that finances a packer and to whom trust assets are transferred. *See, e.g., C.H. Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311, 1313–16 (11th Cir.1992); *Gotham Provision Co.*, 669 F.2d at 1008–12. Indeed, the addition of § 196 to the Act in 1976 was motivated by situations in which sellers of livestock went unpaid, because of the priority interests of secured lenders, when the purchasing packers became insolvent. This history was outlined in *Gotham Provision Co.*, as follows:

> It is clear that the purpose of the 1976 amendments to the Packers and Stockyards Act of 1921 was to provide some future protection for livestock sellers against the type of serious financial loss that cattlemen experienced when some major meat packers went bankrupt in the early 1970's. Of principal concern to Congress was the bankruptcy of American Beef Packers in 1975, at the time one of the largest meat packers in the country. That bankruptcy affected many farmers throughout the country who had delivered their entire year's output of cattle to American Beef Packers and did not receive payment. The provisions of the Uniform Commercial Code placed further impediments in the way of the cattlemen in their battle to obtain compensation, since lenders enjoyed priority over the cattlemen by virtue of secured interests in assets of the packer. The Senate Agriculture and Forestry Committee was explicit in identifying as a target of the legislation the favored position that lenders enjoyed over cattlemen in these situations:

> Of particular concern to the livestock producers ... [in the case of American Beef Packers ("ABP")] was the fact that ABP's principal source of financing, General Electric Acceptance Corporation, stood ahead of them among the bankrupt's creditors by virtue of its duly protected security interest in ABP's inventory, i.e., livestock and derivative products which the producers had sold on a cash basis and for which they had not been paid.

> Under present law, a packer is able to offer as security for a loan the livestock, meat, meat food products, or receivables or proceeds therefrom, which he has not paid for. The producer, who was responsible for raising, feeding, and caring for the livestock is left unpaid, while secured creditors reap the reward of his labors....

> What is needed to prevent future producer tragedies, as occurred following the ABP bankruptcy, is legislation that will afford a measure of protection to the livestock producer and feeder and yet not be so restrictive as to reduce competition in the livestock slaughtering business. H.R. 8410 accomplishes this dual objective.

> S.Rep. No. 932, 94th Cong., 2d Sess. 5–6, *reprinted in* [1976] U.S.Code Cong. & Ad.News 2271, 2272.

669 F.2d at 1008 (alterations in *Gotham*); *see also* § 196(a) *supra* note 1.

*Gotham Provision Co.* cited this history in response to a contention by the appellant secured lender "that common law trust principles should govern the enforcement of the [§ 196(b)] trust; therefore, the appellees must at minimum trace their sales into the accounts receivable over which the Bank held a security interest in order to recover." 669 F.2d at 1008. This position arguably finds support in the language of § 196(b) that specifies as trust assets certain "livestock" together with "inventories of, or receivables or proceeds from meat,

---

any order of the Secretary under this chapter, relating to the purchase, sale, or handling of livestock, the purchase or sale of poultry, or relating to any poultry growing arrangement,

he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.

meat food products, or livestock products *derived therefrom* [emphasis added]."

Conceding that the specific statutory language does not resolve the issue, 669 F.2d at 1010, the Fifth Circuit invoked the legislative history, *id.* at 1010–11, and especially "the nature of the meat packing business where, once slaughtered, animal carcasses are quickly cut into meat products and commingled, [resulting in] a practical impossibility to identify which receivables correspond to which seller's livestock," to reject the tracing requirement. *Id.* at 1011; *see also JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 78 (2d Cir.1990) (noting that § 196(b) has "consistently been interpreted as creating a nonsegregated floating trust," citing legislative history and *Gotham Provision Co.*).

The ruling of the district court in the instant case, however, goes well beyond *Gotham Provision Co.* Bankers Trust was not a secured lender to Arbogast, but rather to Rotches. The receivables in the possession of Bankers Trust and at issue in this litigation are not receivables owed to Arbogast by Rotches, but rather receivables owed to Rotches by *its* customers. These receivables were pledged as security for Rotches' open account with Arbogast, and that security interest was then subordinated to the security interest of Bankers Trust in a Subordination Agreement effected approximately a year prior to the sales of livestock that generated the statutory trust at issue in this litigation.

█ The § 196(b) trust in this case clearly covers receivables due to Arbogast from Rotches for sales of meat products derived from livestock sold to Arbogast by cash sellers. We see nothing in the statutory language, however, that extends the trust to property pledged to Arbogast by Rotches to secure payment of such receivables.

Nor can the language of the statute be sensibly construed to encompass receivables due to Rotches from third parties. The statute requires the *packer* to hold "in trust" certain livestock and derivative products, inventories, proceeds, and receivables. In the ordinary course, the packer would never have title to the products, invento-ries, proceeds, and receivables of third parties like Rotches, and could hardly be commanded to hold "in trust" property to which it never had title in the first place.

Thus, we disagree with the district court's ruling that Arbogast "did not have power to enter into the [Subordination] Agreement which purported to subordinate trust assets, i.e. [Arbogast's] prior security interest in the assets of [Rotches]." 758 F.Supp. at 895 (footnote omitted). That security interest is not encompassed by the language of § 196(b). The statute did not command Arbogast to obtain such a security interest, and it did not constrain Arbogast from subordinating it. It only required that Arbogast hold the receivables due to Arbogast from Rotches, and any proceeds resulting from the payment of those receivables, in trust for cash sellers of livestock to Arbogast.

We see no undermining of the policy of the Act in this ruling. It cannot be plausibly contended that the Act barred Arbogast from selling to Rotches on credit, or required Arbogast to arrange any particular form of security (or for that matter any security at all) for the line of credit that it extended to Rotches. The statute only required that Arbogast pay over to cash sellers of livestock any payments received from Rotches, and not give any third party a preferred position as to the receivables directly due from Rotches to Arbogast. In sum, no § 196(b) claim could be made against Bankers Trust if Arbogast had never obtained any security interest from Rotches. We do not see how such a claim can result because Arbogast obtained such an interest and then, in the exercise of its business judgment, subordinated that interest to one held by Bankers Trust.

We add one caveat to the foregoing. There is in the record an internal Bankers Trust memorandum dated May 10, 1984 that states in part:

A few days ago Dave Rotches, President, called to inform the bank that he decided to cease operations due to problems with [Arbogast]. [Arbogast] over the years has been the subject's major supplier of dressed hogs.

By way of background, a key to the subject's success over the years has been the way in which they bought hogs. Dave Rotches negotiated the prices with farmers who shipped and sold their hogs to [Arbogast] at the price negotiated by Dave Rotches. [Arbogast] paid the farmer and slaughtered the hogs for Rotches. *Under this method, Rotches was able to avoid the Packers and Stockyard Act (title passed to [Arbogast])*. [Emphasis added.] It also allowed him to buy hogs a couple dollars per hundred weight, on average, below the market price.

Our opinion should not be read as addressing any issue regarding a fraudulent or otherwise wrongful circumvention of the Act that could result in Arbogast being regarded as an "alter ego" of Rotches for purposes of § 196(b). *Cf. Central Trust Co. v. B & L Leasing,* 669 F.Supp. 828, 829 (S.D.Ohio 1987) (secured lender challenged status of asserted cash seller because of overlapping ownership with purchaser/statutory trustee). In any such event, of course, some additional showing would be required as to any possible liability of Bankers Trust. *Cf. C.H. Robinson Co.,* 952 F.2d at 1316 (secured lender that receives funds from statutory trustee for value and without notice of breach of trust entitled to retain payments) (dictum); *Gotham Provision Co.,* 669 F.2d at 1011 (secured lender "had constructive notice of the trust because a federal statute created the trust"). In any event, no such case is presented on this appeal.

## Conclusion

We reverse on the appeal, affirm on the cross-appeal, and remand for further proceedings not inconsistent with this opinion.